CHARLES M. WHITE AND EARL ELLIS, INDIVIDUALLY AND NOW OR FORMERLY D/B/A ACE FABRICATION AND WELDING, A NORTH CAROLINA GENERAL PARTNERSHIP V. ANDREW THOMPSON, DOUGLAS THOMPSON, AND FRAN LURKEE, ALIAS

No. 226A09

(Filed 15 April 2010)

**Unfair Trade Practices— allegations between partners—not in or affecting commerce—internal business operations**

The Court of Appeals did not err in a case involving unfair and deceptive trade practice allegations between partners by concluding a partner's actions were not "in or affecting commerce" as that term is used under N.C.G.S. § 75-1.1, and thus not an unfair or deceptive trade practice, because: (1) the General Assembly sought to prohibit unfair or deceptive conduct in interactions between different market participants and did not intend for it to regulate purely internal business operations; and (2) in the instant case the breaching partner's unfair conduct was solely within a single partnership.

Justice HUDSON dissenting.

Justice TIMMONS-GOODSON joining in the dissenting opinion.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 196 N.C. App. —, 676 S.E.2d 104 (2009), affirming in part and reversing in part a judgment entered 12 February 2008 by Judge Douglas B. Sasser in Superior Court, Columbus County. Heard in the Supreme Court 18 November 2009.

*Lee & Lee, by Junius B. Lee, III, for plaintiff-appellants.*

*Ralph G. Jorgensen for defendant-appellees Andrew Thompson and Douglas Thompson.*

NEWBY, Justice.

This case presents the question whether the General Assembly intended unfair or deceptive conduct among partners contained solely within a single business to be "in or affecting commerce" such that a partner's breach of his fiduciary duty owed to his fellow partners violates North Carolina's unfair and deceptive practices act ("the Act"), N.C.G.S. § 75-1.1. With the Act our General Assembly sought to prohibit unfair or deceptive conduct in interactions

between different market participants. The General Assembly did not intend for the Act to regulate purely internal business operations. In the present case the breaching partner's unfair conduct was solely within a single partnership. Accordingly, we hold that his action is not "in or affecting commerce" as that term is used in N.C.G.S. § 75-1.1 and that such conduct is therefore not a violation of the Act. As such, we affirm the decision of the Court of Appeals.

Plaintiffs Charles White and Earl Ellis, along with defendant Andrew Thompson, were partners in an entity known as Ace Fabrication and Welding ("ACE"). The partners formed ACE in October of 2000 primarily for the purpose of performing specialty construction and fabrication work at a plant in Bladen County operated by Smithfield Packing Company, Inc. The three men agreed that each would own one-third of ACE, and each would also receive an hourly wage from ACE for the work each partner actually performed. Shortly after forming ACE, the men acquired certain assets needed to operate their business, including the necessary insurance policies and billing and advertising materials. Also, the partners hired defendant Douglas Thompson, defendant Andrew Thompson's father, as ACE's accountant.

The Smithfield Packing plant at which ACE sought to work used a bidding system to award jobs to either ACE or one of the "five or six" other subcontractors performing specialty fabrication work in the plant. Defendant Andrew Thompson testified that Smithfield Packing would inform those interested in working in the plant of the available jobs. According to him, the three partners would evaluate the available job and then submit ACE's bid to the appropriate individual at Smithfield Packing. Barry White, an employee of Smithfield Packing, testified regarding the bidding process. Barry White stated that although four different individuals must approve purchase orders for jobs to be performed by outside subcontractors, all four individuals are "not necessarily [approving] who gets the job." Barry White "approve[d] the way [the purchase order had] been coded"; the "plant engineer and plant superintendent" approved the firm selected to complete the job; and the "plant manager . . . basically [ensured that the] money's being paid."

From the testimony presented at trial, it appears that ACE enjoyed initial success. Defendant Andrew Thompson testified that ACE won its first job roughly a week after it began submitting bids. Plaintiff White presented similar evidence, explaining that ACE successfully submitted bids and performed work at Smithfield Packing

from late October of 2000 until January of 2001. However, ACE's initial success eventually fell victim to disagreements and infighting among the partners.

The partners described to the jury their disagreements while involved with ACE. Plaintiff White testified that defendant Andrew Thompson misinformed him of some days on which ACE was scheduled to perform specific jobs. Plaintiff White further explained that defendant Andrew Thompson "had a little small crew that he liked to buddy with that he had hired" despite the partners' agreement that "any work was supposed to go between the three [partners] first because [the partners] made more money doing [their] own work." However, defendant Andrew Thompson claimed that the other two ACE partners were frequently unavailable for work. He stated that plaintiff White was frequently unavailable on weekends and was often "at the beach" with his wife. Defendant Andrew Thompson also relayed that plaintiff Ellis operated another business after ACE was formed and often "had places to go." More specifically, he recalled one instance when ACE was "working on wet cement one day and [plaintiff Ellis] said my 40 hours [are] up, let me get out of here." Plaintiff Ellis, however, testified that during every week of ACE's operation, he worked "40 to 50, sometimes 60" hours. Also, plaintiff White explained to the jury that he informed the other two partners before forming ACE that he held another job and asked if either had a problem with his other employment. According to plaintiff White, neither man had any reservation about forming ACE.

The ACE partners' disagreements led to defendant Andrew Thompson's decision to leave the partnership and start his own business, PAL. According to defendant Andrew Thompson, he decided to sever his ties with ACE and begin his own business in January of 2001. Further, he testified that he informed his partners of this decision sometime between 10 January and 15 January 2001. He also stated that after he had informed his partners of his decision to leave ACE, plaintiffs White and Ellis asked him to complete under the ACE name certain jobs which had been awarded to ACE. Defendant Andrew Thompson acceded to plaintiffs' request, explaining that he "finished those jobs in [the] A[CE] name and was also working in the P[AL] name." Plaintiff White, however, testified that he first heard in early February 2001 that defendant Andrew Thompson was starting another business. Moreover, plaintiff White stated that it was defendant Fran Lurkee, a Smithfield Packing employee, who conveyed that defendant Andrew Thompson

"wanted to go on his own" and had already been "doing . . . a great job" in the plant for defendant Lurkee.

The ACE partners experienced similar disharmony in attempting to distribute assets of the business. Apparently, plaintiffs were unable to communicate easily with defendants Douglas and Andrew Thompson after Andrew Thompson's departure from ACE. According to plaintiff White, "[s]ome of the money [disbursed by Smithfield Packing for work ACE had performed] wasn't being deposited [into ACE's account]." Plaintiffs White and Ellis changed the mailing address Smithfield Packing had on file for ACE, for the purpose of receiving payment for work ACE had completed. Plaintiff White also transferred the balance of the ACE bank account to his personal account, explaining that plaintiffs embarked on this course of action to preserve the status quo pending resolution of ACE's affairs. Furthermore, the partners hastily divided ACE's tools, leaving plaintiffs White and Ellis dissatisfied with the distribution. As explained by plaintiff White, defendant Andrew Thompson "threw [ACE's tools] on the floor and [plaintiffs White and Ellis] picked up what [they] had to have."

After defendant Andrew Thompson disassociated himself from ACE, the three former ACE partners continued to work in the Smithfield Packing plant. Plaintiff White testified he and plaintiff Ellis decided to form another business named Whelco. This business, despite being awarded several jobs, remained viable for only a few months. Defendant Andrew Thompson continued to perform work at Smithfield Packing under his new business name, PAL, until roughly October of 2001.

Plaintiffs filed the present lawsuit on 18 October 2002. In their complaint plaintiffs alleged that defendant Andrew Thompson: (1) "acted in derogation of the interests of his partners and the partnership" by, *inter alia*, forming PAL, to which he "funnel[ed] work originally intended for ACE"; (2) conspired with former Smithfield Packing employees, defendants Fran Lurkee and Carl Barnes, "to divert work originally contracted for by ACE . . . to his separate business entity and, on information and belief, paid illegal and improper emoluments for their assistance in this regard"; and (3) conspired with his father, defendant Douglas Thompson, "to improperly keep and maintain the books of ACE." Plaintiffs also contended that the preceding allegations constituted unfair and deceptive trade practices under the Act. Before the jury considered the case, defendant Carl Barnes apparently extinguished any potential liability on his part

in a bankruptcy proceeding, and the trial court directed a verdict in favor of defendant Fran Lurkee. The jury returned a special verdict finding that defendant Andrew Thompson breached his fiduciary duty to plaintiffs "by failing to act fairly, honestly, and openly," and it awarded $138,195.00 in damages against him. The jury also found that defendant Douglas Thompson breached his fiduciary relationship to plaintiffs "by failing to act fairly, honestly, and openly" and awarded $750.00 in damages against him. Pursuant to N.C.G.S. § 75-16, the trial court then, by judgment entered 12 February 2008, trebled these amounts to $414,585.00 and $2,250.00, respectively.

Defendants Andrew Thompson and Douglas Thompson appealed from the trial court's judgment to the Court of Appeals. The majority of a divided panel of that court reversed the portion of the trial court's judgment trebling the damage award with respect to defendant Andrew Thompson. *White v. Thompson*, 196 N.C. App. ——, ——, 676 S.E.2d 104, 108-09 (2009). The majority concluded that Andrew Thompson's usurpation of partnership opportunities was not "in or affecting commerce" as that phrase is used in the Act, stating that his conduct had no impact on the marketplace. *Id.* The dissenting judge, after examining precedent from both this Court and the Court of Appeals, would have held to the contrary. 196 —— N.C. App. at ——, 676 S.E.2d at 111-15 (Ervin, J., concurring in part and dissenting in part). The Court of Appeals otherwise affirmed the trial court's judgment. Plaintiffs appealed to this Court as of right based on the dissenting opinion filed in the Court of Appeals.

Before a plaintiff may avail itself of the Act's remedies, it must prove that a defendant's "conduct falls within the statutory framework allowing recovery." *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 592, 403 S.E.2d 483, 492 (1991). The Act provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C.G.S. § 75-1.1(a) (2009). Thus, a plaintiff must prove, *inter alia*, that a defendant's unfair or deceptive action was "in or affecting commerce" before the plaintiff may be awarded treble damages under N.C.G.S. § 75-16. *Sara Lee Corp. v. Carter*, 351 N.C. 27, 32, 519 S.E.2d 308, 311 (1999) (citation omitted); *HAJMM Co.*, 328 N.C. at 592, 403 S.E.2d at 492 (citation omitted).

In *HAJMM Co.* this Court determined that our General Assembly demonstrated with the text of the Act that it intended the Act to regulate a business's regular interactions with other market participants. 328 N.C. at 594, 403 S.E.2d at 493. There, we observed that

the Act defines " 'commerce' " as " 'business activities.' " *Id.* (quoting N.C.G.S. § 75-1.1(b) (1991)). We explained that the term " '[b]usiness activities' . . . connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized." *Id.* Ultimately, this Court determined that "extraordinary event[s]," such as raising capital, and internal operations of a single business, such as removing a "security from the capital structure," are not business activities within the General Assembly's intended meaning of the term. *Id.* We concluded in *HAJMM Co.* that securities transactions "are not 'business activities' as that term is used in the Act. They are not, *therefore*, 'in or affecting commerce,' even under a reasonably broad interpretation of the legislative intent underlying these terms." *Id.* (emphasis added). Thus, any unfair or deceptive practices occurring in the conduct of extraordinary events of, or solely related to the internal operations of, a business will not give rise to a claim under the Act. 328 N.C. at 594-95, 403 S.E.2d at 493.

Furthermore, in *Bhatti v. Buckland*, this Court observed that the history of the Act indicates that the General Assembly was targeting unfair and deceptive interactions between market participants. 328 N.C. 240, 245-46, 400 S.E.2d 440, 443-44 (1991). The General Assembly originally stated the Act's purpose as follows:

> The purpose of this section is to declare, and to provide civil legal means to maintain, ethical standards of dealings between persons engaged in business, and between persons engaged in business and the consuming public within this State, to the end that good faith and fair dealings between buyers and sellers at all levels of commerce be had in this State.

N.C.G.S. § 75-1.1(b) (1975), *quoted in Bhatti*, 328 N.C. at 245, 400 S.E.2d at 443. Essentially, the General Assembly indicated through its original statement of purpose that the Act was designed to achieve fairness in dealings between individual market participants. To accomplish this goal, the General Assembly explained that the Act would regulate two types of interactions in the business setting: (1) interactions between businesses, and (2) interactions between businesses and consumers. The General Assembly sought for the Act to control any unfair or deceptive conduct occurring in one of these two types of interactions. In *Bhatti* we also observed that, despite a subsequent amendment to the Act, the General Assembly remained de-

voted to regulating unfair and deceptive conduct in interactions between market participants, both businesses and consumers. 328 N.C. at 245-46, 400 S.E.2d at 443-44.

We had occasion to apply these principles in *Sara Lee Corp. v. Carter*, 351 N.C. 27, 519 S.E.2d 308 (1999), and *Dalton v. Camp*, 353 N.C. 647, 548 S.E.2d 704 (2001). In *Sara Lee* an employee of the plaintiff corporation engaged in undisclosed self-dealing by purchasing on plaintiff's behalf computer parts and services supplied by firms in which the employee held a financial interest. 351 N.C. at 29, 519 S.E.2d at 309. We determined the defendant-employee's unfair or deceptive actions were within the Act's ambit because they did not occur solely within the employer-employee relationship, but rather occurred in interactions between the plaintiff and the defendant's outside businesses. *Id.* at 33-34, 519 S.E.2d at 312. In *Dalton*, on the other hand, we examined a situation in which the defendant, who was in the plaintiff's employ at the time of his conduct, formed a competing venture and successfully negotiated for the rights to publish a newspaper that had previously been published by the plaintiff. 353 N.C. at 649, 658, 548 S.E.2d at 706, 711-12. We determined that this conduct, the potential unfairness of which was confined to within a single business, was not within the Act's purview. *Id.* at 658, 548 S.E.2d at 712.

Our prior decisions have determined that the General Assembly did not intend for the Act's protections to extend to a business's internal operations. As we determined in *HAJMM Co.* and *Dalton*, the Act is not focused on the internal conduct of individuals within a single market participant, that is, within a single business. To the contrary, as we observed in *Bhatti* and *Sara Lee*, the General Assembly intended the Act's provisions to apply to interactions between market participants. As a result, any unfair or deceptive conduct contained solely within a single business is not covered by the Act. As the foregoing indicates, this Court has previously determined that the General Assembly did not intend for the Act to intrude into the internal operations of a single market participant.

In the case *sub judice* the unfairness of defendant Andrew Thompson's conduct occurred in interaction among the partners within ACE. Plaintiffs were partners with Andrew Thompson in a single market participant. Plaintiffs alleged and proved that defendant Andrew Thompson breached his fiduciary duty as a partner in this single market participant. Plaintiff White's testimony demonstrated that defendant Andrew Thompson preferred to work with several

men whom he had hired, rather than working with plaintiffs White and Ellis. Also, according to plaintiff White, defendant Andrew Thompson misinformed plaintiffs about the dates of certain projects ACE had contracted to perform and began working independently while still an ACE partner. Because defendant Andrew Thompson unfairly and deceptively interacted only with his partners, his conduct occurred completely within the ACE partnership and entirely outside the purview of the Act.

Plaintiffs contend, however, that defendant Andrew Thompson's conduct is within the Act's ambit because his actions led to the demise of ACE as a viable entity and its removal from the market, thereby reducing competition and potentially affecting prices in that market. Plaintiffs appear to argue that defendant Andrew Thompson's conduct potentially affected the price Smithfield Packing would have to pay for specialty fabrication work. However, this argument overlooks that the unfairness of defendant Andrew Thompson's conduct did not occur in his dealings with Smithfield Packing. Defendant Andrew Thompson was found to have breached his fiduciary duty to his partners through his conduct within the ACE partnership. The General Assembly simply did not intend for such conduct to fall within the Act's coverage.

While we appreciate the cogent, compelling analyses submitted in both the majority and dissenting opinions at the Court of Appeals, we believe the General Assembly did not intend to encompass within the Act defendant Andrew Thompson's conduct. Accordingly, we affirm the decision of the Court of Appeals.

AFFIRMED.

Justice HUDSON dissenting.

Because I would conclude defendant Andrew Thompson's conduct was "in or affecting commerce," as intended and articulated by our legislature in N.C.G.S. § 75-1.1, I respectfully dissent.

Here, as part of its unanimous verdict, the jury found and answered "yes" to the following pertinent special interrogatories:

**ISSUE ONE:**

Did Andrew Thompson have a fiduciary relationship, that is, a relationship of trust and confidence as the Court has explained it to you, with the Plaintiffs?

. . . .

**ISSUE ONE-B:**

Did Andrew Thompson breach his fiduciary duty to the Plaintiffs in the handling of the business affairs of Ace Welding and Fabrication, by failing to act fairly, honestly, and openly?[1]

The jury then found that $138,195 in damages resulted from Andrew Thompson's conduct.[2] The trial court entered judgment thereupon, stating:

> And the plaintiff having at all times asserted that the actions of the defendants constituted unfair and deceptive trade practices, and the jury by special interrogatories having found that the defendants [Andrew Thompson and Douglas Thompson] and each of them had engaged in violations of their fiduciary duties to persons, to wit: the plaintiffs to whom they had developed such relationship of trust and confidence and this court finding by the greater weight of the evidence that the business conducted by the parties, to wit: ACE Welding and Fabrication was a business which was in or affecting commerce, this Court concludes as a matter of law that the damages assessed must be trebled.

As required by law, the trial court then trebled the damages resulting from defendant Andrew Thompson's and defendant Douglas Thompson's conduct and entered judgment in the amounts of $414,585 and $2250 against these defendants, respectively. N.C.G.S. § 75-16 (2009); *Bhatti v. Buckland*, 328 N.C. 240, 243, 400 S.E.2d 440, 442 (1991) ("If a violation of Chapter 75 is found, treble damages must be awarded." (citations omitted)).

Under North Carolina's unfair and deceptive practices act (the "Act"), "[u]nfair methods of competition in or affecting commerce, and unfair or·deceptive acts or practices in or affecting commerce, are declared unlawful." N.C.G.S. § 75-1.1(a) (2009). "In order to establish a *prima facie* claim for unfair [or deceptive] trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff."

1. The jury answered this same question "yes" regarding the conduct of defendant Douglas Thompson and "no" regarding the conduct of plaintiff Charles Michael White and plaintiff Earl Ellis.

2. The jury also found that $750 in damages resulted from Douglas Thompson's conduct. The conduct of these parties and the damages resulting therefrom are not before us on appeal.

*Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001) (citation omitted). We have noted that "[p]laintiff must first establish that defendants' conduct was 'in or affecting commerce' before the question of unfairness or deception arises." *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 592, 403 S.E.2d 483, 492 (1991) (citation omitted).

Our legislature has instructed that "[f]or purposes of th[e Act], 'commerce' includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession." N.C.G.S. § 75-1.1(b) (2009). As noted by this Court, "this statutory definition of commerce is expansive"; nevertheless, "the Act is not intended to apply to all wrongs in a business setting." *HAJMM*, 328 N.C. at 593, 403 S.E.2d at 492. N.C.G.S. § 75-1.1(b) "defines the term 'commerce' to mean 'business activities,' " *id.* at 594, 403 S.E.2d at 493, and "[t]he term 'business' generally imports a broad definition," *Bhatti*, 328 N.C. at 245, 400 S.E.2d at 443 (citation omitted). As explained by this Court, " '[b]usiness activities' is a term which connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized." *HAJMM*, 328 N.C. at 594, 403 S.E.2d at 493.

The majority concludes here that: (1) the legislature intended the Act to regulate acts or conduct between businesses and consumers or between two or more businesses, but not between individuals within the same business; (2) prior decisions of this Court have determined that unfair or deceptive conduct contained within a single business is not covered under the Act; and (3) "[b]ecause defendant Andrew Thompson unfairly and deceptively interacted only with his partners, his conduct occurred completely within the ACE partnership and entirely outside the purview of the Act." I disagree with these conclusions.

First, our legislature has not indicated any intent to exclude unfair or deceptive conduct occurring between persons in the same business from coverage under the Act and in fact, has indicated the contrary. In support of its position, the majority primarily relies on a statement of purpose contained in a prior version of section 75-1.1(b), which states:

> (b) The purpose of this section is to declare, and to provide civil legal means to maintain, ethical standards of dealings

*between persons engaged in business*, and between persons engaged in business and the consuming public within this State, to the end that good faith and fair dealings between buyers and sellers at all levels of commerce be had in this State.

N.C.G.S. § 75-1.1(b) (1975) (emphasis added). In my view, however, this language on its face actually *encompasses* unfair or deceptive conduct that occurs between persons "engaged in" the same business and *supports* the legislature's intent to *include* such conduct under the Act. My conclusion that the legislature intended to include such conduct under the ambit of the Act is further reinforced by the broad definition of " 'commerce' " contained in the current version of N.C.G.S. § 75-1.1(b)[3] and by section 75-16, which states:

> If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict.

*Id.* § 75-16. As a result, I must conclude that instead of applying the Act as our legislature intended, the majority decision significantly undercuts it.

I conclude that Andrew Thompson's conduct here falls well "within the ambit of the inclusive phrase 'business activities, however denominated,' " as articulated in N.C.G.S. § 75-1.1 and as interpreted by this Court. *Bhatti*, 328 N.C. at 246, 400 S.E.2d at 444. " 'Business activities' *is a term which connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized.*" *HAJMM*, 328 N.C. at 594, 403 S.E.2d at 493 (emphases added). In *HAJMM* we held that conduct involving the issuance, transfer, and retirement of revolving fund certificates "is not a business activity which the issuing enterprise was organized to conduct" and does not equate to " 'business activities' as that term is used in the Act." *Id.* Here, unlike in *HAJMM*, the record contains ample evidence to support that ACE "was organized to conduct" certain specialty fabrica-

3. This definition has been in place since 27 June 1977. Act of June 27, 1977, ch. 747, secs. 2, 5, 1977 N.C. Sess. Laws 984, 984, 987.

tion jobs at Smithfield Packing and that bidding for, obtaining, and completing these jobs were "activities [that ACE] regularly engage[d] in and [reflected the purposes] for which it [was] organized." *Id.* The record also contains evidence suggesting that Andrew Thompson's conduct deprived plaintiffs of the ability to complete previously awarded speciality fabrication jobs and to obtain new jobs at Smithfield Packing, which ultimately affected the nature and extent of the market for specialty fabrication products by eliminating ACE as a viable competitor in that market. Consequently, I would conclude, as the trial court did, that Andrew Thompson's conduct falls "within the ambit of the inclusive phrase 'business activities' " and is, therefore, " 'in or affecting commerce' within the meaning and intent of that phrase as used in N.C.G.S. § 75-1.1(a)." *Bhatti*, 328 N.C. at 246, 400 S.E.2d at 444; *see also* N.C.G.S. § 75-16.

Second, even if the majority has correctly concluded that the legislature did not intend to include unfair and deceptive conduct between individuals in the same business under the Act, defendant Andrew Thompson's conduct is still covered under the Act, in that other entities were involved. Here, the majority frames the issue before us as "whether the General Assembly intended unfair or deceptive conduct among partners contained solely within a single business to be 'in or affecting commerce' such that a partner's breach of his fiduciary duty owed to his fellow partners violates . . . N.C.G.S. § 75-1.1." Though plaintiffs White and Ellis and defendant Andrew Thompson were partners in an entity known as Ace Fabrication and Welding ("ACE"), Andrew Thompson's conduct was not contained within a single business or market entity. Here, the record contains ample evidence to support that: (1) while Andrew Thompson was still a partner in ACE, he created his own separate, competing business, PAL, through which he obtained specialty fabrication work at Smithfield Packing and funneled jobs that had been originally awarded to ACE; and (2) Andrew Thompson began to engage in these activities before notifying plaintiffs White and Ellis that he had created PAL and planned to withdraw from ACE. The jury here found that, by usurping these business opportunities for himself and PAL to the exclusion of plaintiffs, Andrew Thompson breached his fiduciary duties to plaintiffs and made himself and PAL a market competitor of plaintiffs. This conduct affected commerce in much the same way as the conduct at issue in *Sara Lee Corp. v. Carter*, in which we held the conduct was covered under the Act. 351 N.C. 27, 31-34, 519 S.E.2d 308, 311-12 (1999) (concluding that the defendant

employee, who was responsible for purchasing computer hardware and services at the best possible price for his employer and had a fiduciary duty to his employer to act accordingly, was properly found liable under the Act when the defendant purchased computer parts and services at high prices from separate businesses he created and controlled while also employed with Sara Lee); *see also HAJMM*, 328 N.C. at 588, 403 S.E.2d at 489 (stating that "[b]usiness partners . . . are each other's fiduciaries as a matter of law" (citing *Casey v. Grantham*, 239 N.C. 121, 124-25, 79 S.E.2d 735, 738 (1954) ("It is elementary that the relationship of partners is fiduciary and imposes on them the obligation of the utmost good faith in their dealings with one another in respect to partnership affairs. Each is the confidential agent of the other, and each has a right to know all that the others know, and each is required to make full disclosure of all material facts within his knowledge in any way relating to the partnership affairs." (citation omitted)))).

Third, notwithstanding the majority's assertion to the contrary, this Court's decisions have not held that "any unfair or deceptive conduct contained within a single business" is excluded from the purview of the Act. None of the cases cited by the majority are predicated on whether said conduct was confined to a single business or market entity. Rather, this Court's analyses of whether the conduct was "in or affecting commerce" centered on the potential exclusion of the conduct from the Act, based on one of the following potential exceptions articulated in prior decisions of this Court or the Court of Appeals: (A) conduct involving an employer-employee relationship, *Dalton*, 353 N.C. at 657-58, 548 S.E.2d at 711-12 (citing *HAJMM*, 328 N.C. at 593, 403 S.E.2d at 492) stating that employer-employee relations are not covered under the Act)); *Sara Lee*, 351 N.C. at 31, 519 S.E.2d at 310 (citing *Buie v. Daniel Int'l Corp.*, 56 N.C. App. 445, 448, 289 S.E.2d 118, 119-20) (same), *disc. rev. denied*, 305 N.C. 759, 292 S.E.2d 574 (1982)); (B) conduct involving "securities transactions," *HAJMM*, 328 N.C. at 593, 403 S.E.2d at 492 (citing *Skinner v. E. F. Hutton & Co.*, 314 N.C. 267, 275, 333 S.E.2d 236, 241 (1985)); or (C) conduct involving a "private homeowner[] selling a residence," *Bhatti*, 328 N.C. at 244, 400 S.E.2d at 443. In *Dalton* we held that summary judgment in the defendants' favor on the employer's Chapter 75 claim was proper because, unlike the employee in *Sara Lee*, employee defendant Camp did not have a fiduciary duty to his employer, nor did he serve his employer in the capacity of a buyer or seller or "in any alternative capacity suggesting that his employ-

ment . . . otherwise qualified as 'in or affecting commerce.' " 353 N.C. at 658, 548 S.E.2d at 711-12.

Rather than supporting the majority's view, this Court's decision in *Sara Lee* strongly indicates that the type of self-dealing found by the jury here is exactly the type of conduct that is covered under the Act. *See* 351 N.C. at 34, 519 S.E.2d at 312 (holding that because the defendant employee breached his fiduciary duty to his employer to obtain computer parts and services at the lowest possible price and engaged in self-dealing and " 'business activities' " by purchasing these parts and services at inflated prices from companies in which he had a financial interest, "defendant's mere employee status . . . does not safeguard him from liability under the Act"). Indeed, in its discussion of the very definition of " 'commerce,' " this Court noted that the Act is subject to a "reasonably broad interpretation" and that " 'we have not limited [the Act's] applicability . . . to cases involving consumers only. After all, unfair trade practices involving only businesses affect the consumer as well.' " *Id.* at 32, 519 S.E.2d at 311 (quoting *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 665, 370 S.E.2d 375, 389 (1988) (citation omitted)). Further, this case is not analogous to *HAJMM*. 328 N.C. at 594-95, 403 S.E.2d at 493 (holding that "[r]evolving fund certificates are a cooperative's functional equivalent of traditional corporate securities" and "therefore, . . . like more conventional securities, [the] issuance or redemption of revolving fund certificates are not 'in or affecting commerce' "). Moreover, in *Bhatti* this Court held that the conduct of an individual selling real estate could potentially be covered under the Act. 328 N.C. at 246, 400 S.E.2d at 444 (holding that on the "sparse facts in th[e] record," the transaction "involved a buyer and seller in a commercial context to which the protections afforded by section 75-1.1" apply, and thus, "the sale fell within the ambit of the inclusive phrase 'business activities, however denominated,' and was therefore 'in or affecting commerce' within the meaning and intent of that phrase as used in N.C.G.S. § 75-1.1(a)" (internal citation omitted)). None of these cases can be read as compelling, or even pointing in the direction of, the conclusions reached by the majority.

Finally, I disagree with the majority's conclusion that "the unfairness of defendant Andrew Thompson's conduct did not occur in his dealings with Smithfield Packing" and as such, cannot be covered under the Act. As this Court has previously stated, "unfair [and deceptive] trade practices involving only businesses affect the consumer as well." *Kuykendall*, 322 N.C. at 665, 370 S.E.2d at 389. And, as the

record demonstrates, ACE's (and PAL's) business activities of bidding for, obtaining, and completing specialty fabrication work at Smithfield Packing necessarily involved Smithfield Packing as a potential or actual consumer.

Regardless of whether Andrew Thompson committed unfair or deceptive acts directly against Smithfield Packing itself, neither the Act nor this Court's case law mandates that unfair or deceptive conduct committed by a person engaged in business against another person or persons engaged in business must occur in dealings with a consumer in order for the conduct and the resulting injury to be covered under the Act. *See, e.g.,* N.C.G.S. § 75-16. By reversing the judgment against defendant Andrew Thompson, the majority, for the first time since Chapter 75 was enacted, has created out of whole cloth an exemption for a huge segment of business conduct. This decision has potentially widespread and damaging consequences for businesses and consumers alike, by essentially rewriting the statute to eliminate the accountability our legislature intended for unfair dealings within a business.

For these reasons, I would hold that defendant Andrew Thompson's conduct was "in or affecting commerce" and that the trial court correctly concluded that his conduct was actionable under the Act. I would reverse the Court of Appeals and reinstate the judgment based on the jury's verdict. Therefore, I respectfully dissent.

Justice TIMMONS-GOODSON joins in this dissenting opinion.