LLG-NRMH, LLC v. N. Riverfront Marina & Hotel, LLLP, 2018 NCBC 104.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 4522

LLG-NRMH, LLC; 10 HARNETT
BLACKFINN WILMINGTON, LLC;
LLG-VW, LLC; and 10 HARNETT
VIDA WILMINGTON, LLC,

        Plaintiff,

v.

NORTHERN RIVERFRONT
MARINA & HOTEL, LLLP;
WILMINGTON RIVERFRONT
DEVELOPMENT, LLC; VIDA
WILMINGTON, LLC; USA
INVESTCO, LLC; and CHARLES
SCHONINGER,

        Defendants,

and

NORTHERN RIVERFRONT
MARINA & HOTEL, LLLP,

        Third-Party
        Plaintiff,

v.

ROBERT DURKIN,

        Third-Party
        Defendant.

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO DISMISS**

1. This action arises out of a dispute between the co-owners of two failed restaurants in Wilmington, North Carolina. Plaintiffs pin the failures on Defendant Charles Schoninger, alleging that he, and several entities he owns or controls, failed to deliver promised funding, diverted assets to other personal and professional uses, and interfered with restaurant management and operations. In response,

Defendants put the blame on Plaintiffs, alleging mismanagement and misuse of funds.

2.    The subject of this Opinion is Defendants' motion to dismiss some but not all of Plaintiffs' claims under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure.  For the following reasons, the Court **GRANTS** the motion.

> *James, McElroy & Diehl, P.A., by John R. Buric and John R. Brickley, for Plaintiffs LLG-NRMH, LLC, 10 Harnett BlackFinn Wilmington, LLC, LLG-VW, LLC, and 10 Harnett Vida Wilmington, LLC.*
>
> *Jones, Hewson & Woolard, by Lawrence J. Goldman, for Defendants Northern Riverfront Marina & Hotel, LLLP, Wilmington Riverfront Development, LLC, Vida Wilmington, LLC, USA InvestCo, LLC, and Charles Schoninger.*

Conrad, Judge.

I.
BACKGROUND

3.    The Court does not make findings of fact in deciding motions filed under Rule 12(b)(6).  The following factual summary is drawn from relevant allegations in the complaint.

4.    The parties' relationship goes back to 2012.  At that time, Schoninger conceived the idea of opening restaurants in Wilmington.  (*See* Mot. Appt. Receiver, Mot. for Attachment, & V. Compl. ¶ 18, ECF No. 3 ["Compl."].)  Schoninger, a real-estate developer, had no experience with restaurants, so he approached others who did, namely the principals of Plaintiffs 10 Harnett BlackFinn Wilmington, LLC and 10 Harnett Vida Wilmington, LLC (collectively, "Harnett Entities").  (*See* Compl. ¶¶ 18–20.)

5.     According to the complaint, Schoninger's pitch was simple.  He would provide all the funding, and the Harnett Entities would perform the necessary management and consulting services.  (*See* Compl. ¶ 20.)  Any profits would be split "on a sliding scale over time."  (Compl. ¶ 20.)  Schoninger also represented that he had already raised $25,000,000 from Chinese investors through the federal government's EB-5 program.  (Compl. ¶¶ 21–22.)  (The EB-5 program permits foreign investors to become permanent residents in return for commercial investments that create jobs for American workers.)  The parties struck a deal and agreed to develop two restaurants, known as BlackFinn and Vida Cantina.  (Compl. ¶¶ 15, 31.)

6.     Although work on the projects began immediately, it was not until August 2015 that the parties memorialized their agreement in writing.  They did so by executing operating agreements for two limited liability companies—LLG-NRMH, LLC and LLG-VW, LLC—that the parties created to own and operate the restaurants.  (*See* Compl. ¶¶ 16, 17, 23.)  Neither agreement is attached to the complaint.  As alleged, though, each agreement states that Schoninger (through companies he controls) would supply the capital and that the Harnett Entities would contribute a license for the restaurant concepts along with management and consulting services.  (*See* Compl. ¶¶ 24, 25, 27–29.)  Schoninger and Robert Durkin were appointed as the managers of LLG-NRMH and LLG-VW.  (Compl. ¶ 26.)

7.     The organizational structures of LLG-NRMH and LLG-VW are complex, allegedly so as to comply with the EB-5 program.  (*See* Compl. ¶ 38.)  LLG-NRMH's members are 10 Harnett BlackFinn Wilmington and Defendant Northern Riverfront

Marina & Hotel, LLLP ("Northern Riverfront"). (Compl. ¶¶ 6, 16.) Northern Riverfront is owned in part by Defendant Wilmington Riverfront Development, LLC (with a 90 percent interest) and in part by unidentified Chinese investors (who own the other 10 percent). (Compl. ¶ 16.) Wilmington Riverfront Development, in turn, has two members, Schoninger and John Wang. (Compl. ¶ 16; *see also* Compl. ¶ 41.)

8. LLG-VW is similarly structured, with 10 Harnett Vida Wilmington and Defendant Vida Wilmington, LLC as its only members. (Compl. ¶¶ 17, 26.) Vida Wilmington is owned by Defendant USA InvestCo, LLC and by unidentified Chinese investors. (Compl. ¶ 17.) USA InvestCo is owned jointly by Schoninger and Wang. (Compl. ¶ 17.) The complaint does not state what percentage interest the Chinese investors hold in Vida Wilmington or whether they are the same as, or overlap with, the investors in Northern Riverfront.

9. According to the complaint, the projects were plagued by debt and delay from the outset. By 2015, Schoninger had used some or all of the EB-5 funds on other projects "and to fund his extravagant personal lifestyle." (Compl. ¶ 33.) As a result, funding ran short, and the parties had to take out loans. (Compl. ¶¶ 32, 35–37.) This cycle repeated in 2017: Schoninger informed Plaintiffs that he had exhausted his EB-5 funds and bank loans, again asking the Harnett Entities for help. (*See* Compl. ¶ 37.)

10. Also in 2017, Schoninger began pushing to restructure the businesses. Although LLG-NRMH and LLG-VW had supposedly been designed with the EB-5 program in mind, Schoninger told the Harnett Entities that changes were needed to

satisfy EB-5 regulations. (*See* Compl. ¶ 39.) He proposed to eliminate the Harnett Entities' membership interests in LLG-NRMH and LLG-VW and, instead, to have them enter into management agreements with Northern Riverfront and Vida Wilmington. (*See* Compl. ¶ 39.) After seeing the draft management agreements, the Harnett Entities refused. (Compl. ¶ 42.) They now allege the proposal had nothing to do with the EB-5 program but was instead an effort to push them aside so that Schoninger could seek more money from other investors. (*See* Compl. ¶ 41.)

11. BlackFinn eventually opened, rushed and undercapitalized, in May 2017. (*See* Compl. ¶¶ 47, 48, 55.) Initial success faded quickly. As alleged, Schoninger began interfering with the restaurant's management. (*See* Compl. ¶ 50.) He also took money out of BlackFinn's operating account, resulting in bounced checks to vendors and insufficient funds to meet payroll. (*See* Compl. ¶¶ 56, 57.) On another occasion, Schoninger took food and alcohol from BlackFinn to throw a party at Vida Cantina, all to convince his Chinese investors that Vida Cantina was open to the public and fully operational. (*See* Compl. ¶ 58.) In fact, Vida Cantina never opened, allegedly due to Schoninger's failure to supply his required capital contribution. (*See* Compl. ¶ 63.)

12. After BlackFinn opened, Schoninger again attempted to reorganize the operating companies along the lines he had proposed in March 2017. (*See* Compl. ¶ 51.) By September 2017, discussions had broken down for good. (*See* Compl. ¶ 53.) Shortly after, Schoninger purported to terminate the Harnett Entities' management of BlackFinn and excluded them from LLG-NRMH's bank account. (*See* Compl.

¶¶ 59, 61.) He and Northern Riverfront then closed the restaurant. (Compl. ¶ 62.) The Harnett Entities believe Schoninger intends to open new restaurants to replace BlackFinn and Vida Cantina, without their participation but using their "furniture, equipment, proprietary systems, methods, processes, other intellectual property, and trade secrets." (Compl. ¶ 62; *see also* Compl. ¶ 63.)

13. In this action, the Harnett Entities assert a mix of direct claims and derivative claims on behalf of LLG-NRMH and LLG-VW, including fraud, breach of fiduciary duty, conversion, unfair or deceptive trade practices under N.C. Gen. Stat. § 75-1.1, constructive trust, and others. Defendants deny any wrongdoing, and Northern Riverfront has responded with counterclaims alleging a number of improper acts by Plaintiffs, including misuse of funds.

14. Defendants also moved to dismiss Plaintiffs' claims for unfair or deceptive trade practices and constructive trust. (ECF No. 11.) After briefing, the Court held a hearing on August 15, 2018. (ECF Nos. 20, 30.) The motion is now ripe for determination.

## II.
## LEGAL STANDARD

15. A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of the complaint." *Concrete Serv. Corp. v. Inv'rs Grp., Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986). The motion should be granted "(1) when the complaint on its face reveals that no law supports [the] claim; (2) the complaint on its face reveals the absence of a fact sufficient to make a good claim; [or] (3) some fact disclosed in the

complaint necessarily defeats [the] claim." *Jackson v. Bumgardner*, 318 N.C. 172, 175, 347 S.E.2d 743, 745 (1986).

16. In deciding a Rule 12(b)(6) motion, the Court must treat the well-pleaded allegations of the complaint as true and view the facts and permissible inferences "in the light most favorable to" the plaintiff. *Ford v. Peaches Ent. Corp.*, 83 N.C. App. 155, 156, 349 S.E.2d 82, 83 (1986); *see also Sutton v. Duke*, 277 N.C. 94, 98, 176 S.E.2d 161, 163 (1970). "[T]he court is not required to accept as true any conclusions of law or unwarranted deductions of fact." *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 56, 554 S.E.2d 840, 844 (2001).

## III.
## ANALYSIS

17. Defendants present two issues. The first is whether Plaintiffs' section 75-1.1 claim must be dismissed because the acts alleged in the complaint "are not in or affecting commerce." (Defs.' Br. in Supp. 2, ECF No. 25 ["Defs.' Br."].) The second is whether a constructive trust is a remedy, rather than a claim for relief. (*See* Defs.' Br. 3.) The Court begins with section 75-1.1.

### A. Unfair or Deceptive Trade Practices

18. By statute, "unfair or deceptive acts or practices in or affecting commerce" are "unlawful." N.C. Gen. Stat. § 75-1.1. As construed by our Supreme Court, this language is broad enough "to regulate a business's regular interactions with other market participants" but not so broad as to capture conduct "solely related to the internal operations of" a business. *White v. Thompson*, 364 N.C. 47, 51–52, 691 S.E.2d 676, 679 (2010); *see also HAJMM Co. v. House of Raeford Farms, Inc.*, 328

N.C. 578, 594, 403 S.E.2d 483, 493 (1991). Thus, "any unfair or deceptive conduct contained solely within a single business is not covered by" section 75-1.1. *White*, 364 N.C. at 53, 691 S.E.2d at 680; *see also Brewster v. Powell Bail Bonding, Inc.*, 2018 NCBC LEXIS 76, at *17 (N.C. Super. Ct. July 26, 2018) (collecting cases).

19. Defendants contend that their alleged conduct occurred within a single business—either LLG-NRMH or LLG-VW—and thus was not in or affecting commerce. (*See* Defs.' Br. 2–3.) Plaintiffs respond that "[n]umerous" market participants were "involved and affected by this dispute." (Pls.' Mem. in Opp'n 9–10, ECF No. 31 ["Opp'n"].)

20. The Court agrees with Defendants. At bottom, this dispute is one about the ownership and management of LLG-NRMH and LLG-VW, along with the two restaurants they owned, developed, and operated. Construing the complaint liberally, the alleged unfair or deceptive acts by Defendants include (1) the failure to properly capitalize the companies, (*see* Compl. ¶¶ 20, 24, 35–37, 44, 46, 63); (2) the wrongful demand to reorganize them, (s*ee* Compl. ¶¶ 39–42, 51–53); (3) interference with the management of the restaurants, (*see* Compl. ¶¶ 50, 54); and (4) misappropriation of funds and other assets, (*see* Compl. ¶¶ 33, 56). Each of these acts, even if accepted as true, was internal to LLG-NRMH or LLG-VW and therefore not in or affecting commerce.

21. Defendants' obligation to contribute capital, for example, arises directly from the operating agreements for LLG-NRMH and LLG-VW. These are "internal agreement[s] between [the] members" of the companies, which exist for the purpose

of governing the companies' internal operations. *Urquhart v. Trenkelbach*, 2017 NCBC LEXIS 12, at \*13 (N.C. Super. Ct. Feb. 8, 2017); *see also* N.C. Gen. Stat. § 57D-2-30 ("The operating agreement governs the internal affairs of an LLC . . . ."). As a result, even assuming Schoninger and the other Defendants violated their obligation to make capital contributions, the violations occurred solely within "the internal affairs of" LLG-NRMH and LLG-VW. *Id.* They do not concern the companies' "regular interactions with other market participants." *White*, 364 N.C. at 51, 691 S.E.2d at 679 (citing *HAJMM Co.*, 328 N.C. at 594, 403 S.E.2d at 493).

22. The analysis is essentially the same for Schoninger's attempt to amend the operating agreements to eliminate the Harnett Entities' membership interests. Disputes between co-owners over their ownership interests are, by their nature, internal. *See Chisum v. Campagna*, 2017 NCBC LEXIS 102, at \*33–35 (N.C. Super. Ct. Nov. 7, 2017) (dismissing section 75-1.1 claim based on, among other things, defendant's attempts to amend operating agreements to alter plaintiff's ownership interest); *see also Wilson v. Blue Ridge Elec. Membership Corp.*, 157 N.C. App. 355, 358, 578 S.E.2d 692, 694–95 (2003) (affirming dismissal of section 75-1.1 claim based on defendant's modification of corporation's by-laws to prevent plaintiff from serving on the board).

23. The remaining unfair acts include Schoninger's alleged interference with restaurant management and misappropriation of assets. Management disputes are a classic example of conduct solely related to a business's internal operations. Indeed, Plaintiffs specifically allege that Schoninger "interfered with *10 Harnett BlackFinn's*

and the operations team's ability to provide" management services. (Compl. ¶ 50 (emphasis added).) Thus, as alleged, the unfair conduct was directed at a co-owner and co-manager. *See White*, 364 N.C. at 54, 691 S.E.2d at 680.

24. Plaintiffs contend that the alleged misappropriation of assets is different because Schoninger used the assets (including property contributed by the Harnett Entities) for his own personal and professional endeavors, separate from the restaurants. (*See* Opp'n 10–11.) But this Court and our Court of Appeals have held that similar actions were "more properly classified as the misappropriation of corporate funds within a single entity rather than commercial transactions between separate market participants." *Alexander v. Alexander*, 792 S.E.2d 901, 905 (N.C. Ct. App. 2016); *accord Potts v. KEL, LLC*, 2018 NCBC LEXIS 24, at \*13–14 (N.C. Super. Ct. Mar. 27, 2018); *Urquhart*, 2017 NCBC LEXIS 12, at \*12–13. That Schoninger advanced the interests of his own entities at the expense of the Harnett Entities "does not change the fundamental character of the dispute." *JS Real Estate Invs. LLC v. Gee Real Estate, LLC*, 2017 NCBC LEXIS 104, at \*21 (N.C. Super. Ct. Nov. 9, 2017) (noting that "*White* itself involved a partner's breach of fiduciary duty by diverting work to his own business and away from the partnership," which the Supreme Court deemed outside the scope of section 75-1.1). Schoninger's alleged conduct may well be unfair, but the unfairness "inheres in the relationship between" Schoninger, through his entities, and the Harnett Entities "*as co-owners* of" LLG-NRMH and LLG-VW. *Potts*, 2018 NCBC LEXIS 24, at \*15 (emphasis in original).

25.     Plaintiffs offer three other arguments. They contend, first, that Defendants are not all parties to any operating agreement, such that the disputes cannot all be internal. (*See* Opp'n 9.) Not so. Each of the Defendants is part of the complex, nested corporate structure that the parties chose for LLG-NRMH and LLG-VW. The "fact that separate entities comprise [a] single market participant does not" make external what is otherwise internal to the business. *Polyquest, Inc. v. Vestar Corp.*, 2014 U.S. Dist. LEXIS 14905, at *35 (E.D.N.C. Feb. 6, 2014).

26.     Plaintiffs next contend that Defendants' wrongful acts harmed the Chinese EB-5 investors, each of whom Plaintiffs describe as "an independent market participant," by deceiving them as to the purpose and success of their investments. (Opp'n 9–10.) On the face of the complaint, though, the EB-5 investors are not external to either LLG-NRMH or LLG-VW. Rather, they are also co-owners, albeit indirectly, through their interests in two parent entities, Wilmington Riverfront and Vida Wilmington. (*See* Compl. ¶¶ 16, 17.) At the hearing, Plaintiffs' counsel argued that the precise nature of the EB-5 investors' involvement is unclear and that they need discovery to explore it. For purposes of this motion, though, the Court must evaluate what Plaintiffs have alleged, not what they could allege with more investigation. Plaintiffs were required to allege all necessary elements, including that Defendants' conduct was in or affecting commerce. As alleged, it was not.[*]

---

[*] The Court doubts whether unfair conduct directed toward the Chinese investors would be in or affecting commerce even if those investors are external to the businesses. Although the complaint does not describe in detail the nature of the transactions, Schoninger's alleged interactions with the EB-5 investors involved solicitation of their investments. (*See* Compl. ¶¶ 33, 58.) Our Supreme Court has held that unfair or deceptive conduct involving "extraordinary event[s] done for the purpose of raising capital" are beyond the scope of section

27. Third, and finally, Plaintiffs argue that Defendants' actions caused harm in the broader marketplace, including to contractors, vendors, and the City of Wilmington, due to failures to make payments or to fulfill other agreements. (*See* Opp'n 10.) At most, these allegations suggest that Defendants' actions within LLG-NRMH and LLG-VW also had consequences outside the company. There is no allegation, though, that Defendants directed their unfair or deceptive conduct toward the marketplace in general. The tangential or "indirect involvement of other market participants" does not "trigger liability under [s]ection 75-1.1." *Powell v. Dunn*, 2014 NCBC LEXIS 3, at *10 (N.C. Super. Ct. Jan. 28, 2014); *see also Wheeler v. Wheeler*, 2018 NCBC LEXIS 38, at *13–14 (N.C. Super. Ct. Apr. 25, 2018); *JS Real Estate Invs.*, 2017 NCBC LEXIS 104, at *21.

28. For these reasons, the Court grants Defendants' motion to dismiss Plaintiffs' section 75-1.1 claim. In its discretion, though, the Court dismisses this claim without prejudice to Plaintiffs' ability to seek leave to amend the complaint to assert a valid section 75-1.1 claim during the course of discovery.

### B. Constructive Trust

29. Defendants also argue that the Court should dismiss Plaintiffs' claim for a constructive trust because a constructive trust is a remedy, not a claim for relief. (*See* Defs.' Br. 3.) Plaintiffs do not object to dismissal "provided that such dismissal is

---

75-1.1. *HAJMM Co.*, 328 N.C. at 594, 403 S.E.2d at 493; *see also Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 62, 554 S.E.2d 840, 848 (2001); *Tillery Envtl. LLC v. A&D Holdings, Inc.*, 2017 NCBC LEXIS 68, at *11–16 (N.C. Super. Ct. Aug. 4, 2017).

without prejudice" to their ability to seek a constructive trust as a remedy for their remaining claims. (Opp'n 14–15 (citation and quotation marks omitted).)

30. The Court agrees that a constructive trust is not a standalone claim for relief or cause of action. *See Weatherford v. Keenan*, 128 N.C. App. 178, 179, 493 S.E.2d 812, 813 (1997). Accordingly, for purposes of clarity, the Court grants Defendants' motion to dismiss to the extent it seeks dismissal of the purported cause of action for a constructive trust. The Court renders this decision without prejudice to Plaintiffs' ability to pursue the equitable remedy of a constructive trust to the extent one or more other claims for relief may justify such a remedy. *See Roper v. Edwards*, 323 N.C. 461, 464, 373 S.E.2d 423, 424–25 (1988) (describing constructive trust as an equitable remedy "to prevent the unjust enrichment of the holder of . . . an interest in[] property which such holder acquired through fraud").

IV.
CONCLUSION

31. For the foregoing reasons, the Court **GRANTS** the motion to dismiss and **ORDERS** that:

a. Plaintiffs' claim for unfair or deceptive trade practices is **DISMISSED** without prejudice; and

b. Plaintiffs' claim for a constructive trust is **DISMISSED** without prejudice to their right to seek a constructive trust as a remedy for their surviving claims for relief.

This the 9th day of October, 2018.


/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
 for Complex Business Cases