JS Real Estate Invs. LLC v. Gee Real Estate, LLC, 2017 NCBC 102.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 22232

JS REAL ESTATE INVESTMENTS
LLC, a Delaware Limited Liability
Company,

        Plaintiff,

v.

GEE REAL ESTATE, LLC, a North
Carolina Limited Liability Company;
and RAYMOND M. GEE,

        Defendants.

**ORDER AND OPINION
ON MOTIONS FOR PARTIAL
SUMMARY JUDGMENT**

1.    This case is one of several related cases arising from business dealings between James Shaw and Raymond Gee. In 2014, Shaw and Gee agreed to end their business relationship and divide their interests. As part of that agreement, they decided to continue the operations of two property management companies jointly owned by Plaintiff JS Real Estate Investments LLC ("JS Real Estate") and Defendant Gee Real Estate, LLC. It was further agreed that Gee and Gee Real Estate would manage these assets and that the companies' proceeds would be shared equally by JS Real Estate and Gee Real Estate.

2.    According to JS Real Estate, Defendants have failed to honor the agreement. It contends that Defendants restructured the companies' business affairs and siphoned away the proceeds through self-dealing. Defendants deny any wrongdoing and contend that their actions were consistent with the parties' agreement and their management responsibilities.

3. JS Real Estate has moved for partial summary judgment on its claim for breach of contract, and Defendants have moved for partial summary judgment on the claims for breach of fiduciary duty, constructive fraud, and unfair or deceptive trade practices. Having considered all relevant matters of record, the Court **DENIES** JS Real Estate's motion and **GRANTS in part** and **DENIES in part** Defendants' motion.

*Robinson, Bradshaw & Hinson, P.A., by Julian H. Wright, Jr. and, Stuart L. Pratt, for Plaintiff.*

*Baucom, Claytor, Benton, Morgan & Wood P.A., by Rex C. Morgan, for Defendants.*

Conrad, Judge.

I.
BACKGROUND

4. The Court does not make findings of fact in ruling on motions for summary judgment. The following background, drawn from the evidence submitted in support of and opposition to the parties' motions, is intended to provide context for the Court's analysis and ruling.

5. Shaw and Gee, college acquaintances in the 1980s, reconnected after the 2008 recession. (Gee Aff. ¶ 3, ECF No. 60.) They engaged in a flurry of business deals, including real estate investments, through several jointly owned companies. (*See, e.g.*, Dissolution and Separation Agreement pp.1–4 ["Separation Agreement"], ECF No. 49 Ex. A.)

6. This dispute concerns investments in two properties leased to the United States Department of Veterans Affairs ("VA"). In 2010, Shaw and Gee purchased the

Middletown VA Community Based Medical Clinic, a "medical facility" in Middletown, Ohio that "was subject to a 20 year lease to the" VA. (Gee Aff. ¶¶ 6–7.) In 2011, they purchased a second property in Smyrna, Tennessee that was "being used as a Consolidated Patient Account Center" and was also "subject to a 20 year lease with the" VA. (Gee Aff. ¶ 10.) Shaw and Gee formed Middletown VA, LLC and Smyrna VA, LLC to own the properties. (*See* Gee Aff. ¶¶ 7, 11; Shaw Aff. ¶¶ 2–3, ECF No. 49 Ex. B.)

7. In separate transactions in 2012 and 2013, Middletown VA and Smyrna VA (along with the underlying VA facilities) were sold to third parties. (*See* Gee Aff. ¶¶ 7, 11; Shaw Aff. ¶¶ 3–4.) According to Gee, the new owners purchased the properties as a means to receive tax benefits but did not want to "participate in the management, operation or maintenance" of the VA buildings. (Gee Aff. ¶ 8; *see also* Gee Aff. ¶ 11.) Shaw and Gee agreed to continue providing asset and property management services, and they created two new entities for that purpose—Middletown VA Management, LLC and Smyrna VA Management, LLC (collectively, "Management Companies"). (Gee Aff. ¶¶ 8, 11, 13; Shaw Aff. ¶¶ 3–4.) Gee Real Estate, a company owned by Gee, and JS Real Estate, a company owned by Shaw, are equal members of each of the Management Companies, which are both organized under the laws of Delaware. (Gee Aff. ¶¶ 2, 8, 11; Shaw Aff. ¶ 2.)

8. To memorialize the arrangement, Middletown VA (now owned by a third party) and Middletown VA Management entered into an Advisory and Services Asset Management Agreement. (Advisory and Services Asset Mgmt. Agreement

["Middletown Mgmt. Agreement"], ECF No. 49 Ex. D.) As relevant here, Middletown VA Management receives a "Management Fee" equal to all excess cash flow generated by the property in a given fiscal year. (Middletown Mgmt. Agreement ¶ 3.1.) Smyrna VA Management entered into a substantially similar agreement with Smyrna VA. (Advisory and Services Asset Mgmt. Agreement ¶ 3.1 ["Smyrna Mgmt. Agreement"], ECF No. 49 Ex. F.)

9. The Management Companies have no employees and, as a result, rely on other companies to carry out their day-to-day management obligations. (Gee Aff. ¶ 14; Gee Dep. Tr. II 195:10–196:8, ECF No. 60.) Before April 2014, Smyrna VA Management relied on Gvest Partners LLC, a company equally owned by Shaw and Gee, to perform both property and asset management. (*See* Gee Aff. ¶¶ 15–16, 22; Shaw Aff. ¶ 6.) During the same period, Middletown VA Management engaged Gvest Partners to perform asset management services, but property management was provided by Neyer Property Management, LLC ("Neyer"). (*See* Gee Aff. ¶¶ 6, 7.)

10. The record as to the fiscal operations of the Management Companies during this period is unclear. The parties appear to agree that the Management Companies made no distributions to JS Real Estate and Gee Real Estate. (Gee Aff. ¶ 28; Shaw Aff. ¶ 6.) In his affidavit, Shaw states that the excess cash flow received by the Management Companies was paid to Gvest Partners and divided equally between Shaw and Gee. (*See* Shaw Aff. ¶ 6.) Other evidence suggests that Gvest Partners and Neyer also received compensation for their services directly from the property owners. (*See* Gee Aff. ¶ 16.)

11. In April 2014, Shaw and Gee decided to part ways. They executed a Dissolution and Separation Agreement ("Separation Agreement") for the purpose of "separat[ing] from each other" and "dividing their respective interests." (Separation Agreement p.1.) The Separation Agreement states that the Management Companies will "continue their current business affairs"; that "[p]roceeds from such business affairs shall be equally shared by" JS Real Estate and Gee Real Estate; and that Gee and Gee Real Estate "will manage these assets." (Separation Agreement ¶ IV.)

12. Shaw and Gee further agreed to dissolve Gvest Partners. (Separation Agreement ¶ II.) As of the date of the Separation Agreement, Gvest Partners stopped providing management services to the Management Companies. (*See* Gee Aff. ¶ 18.)

13. Following execution of the Separation Agreement, Defendants exercised their managerial authority and replaced Gvest Partners and Neyer with Gvest Capital, LLC, a company owned by Gee. (Gee Aff. ¶ 22; Gee Dep. Tr. I 233:16–233:25, ECF No. 49 Ex. C.) Gvest Capital now performs all "asset and property management obligations under the Middletown and Smyrna Advisory Agreements." (Gee Aff. ¶¶ 22.) In return, Gvest Capital receives a total of $17,000 per month in fixed fees from Middletown VA and Smyrna VA. These fees are set forth in a series of property and asset management agreements executed by Gee in March 2015 and backdated to April 2014. (Gee Aff. ¶¶ 24–26; Middletown Management Agreement, ECF No. 50 Ex. K; Smyrna Management Agreement Sch. B, ECF No. 50 Ex. L.)

14. According to JS Real Estate, these new agreements improperly restructure the business affairs of the Management Companies in violation of the Separation

Agreement. Gvest Capital's fees are treated as operating expenses and, as a result, are paid before the Management Companies can receive any excess cash flow. (Shaw Aff. ¶ 7; Excerpts from 2010 Escrow Agreement, ECF No. 50 Ex. I; Excerpts from 2011 Escrow Agreement, ECF No. 50 Ex. J; Gee Dep. Tr. I 303:5–303:9.) Shaw states that the amount of Gvest Capital's fees, which includes a profit, has "reduced or eliminated the excess cash flow" that would otherwise be paid to the Management Companies and, in turn, distributed between JS Real Estate and Gee Real Estate. (Shaw Aff. ¶ 8; *see also* Gee Dep. Tr. IV 430:6–430:11, ECF No. 68.1 Ex. B.) Since 2014, the Management Companies have not made any distributions to JS Real Estate or Gee Real Estate. (Shaw Aff. ¶ 9; Broadbooks Aff. ¶ 8, ECF No. 60.)

15. In this action, JS Real Estate is pursuing claims for breach of contract, breach of fiduciary duty, constructive fraud, and unfair or deceptive trade practices. (Compl., ECF No. 1.) On June 2, 2017, after the close of discovery, the parties filed cross-motions for partial summary judgment. (Pl.'s Mot. for Partial Summ. J., ECF No. 47; Defs.' Mot. for Partial Summ. J., ECF No. 51.) The Court held a hearing on both motions on August 31, 2017, at which all parties were represented by counsel. (Notice of Hearing, ECF No. 67.) The motions are ripe for resolution.

II.
ANALYSIS

16. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c). In deciding a motion for summary

judgment, the Court views the evidence "in the light most favorable to the non-mov[ant]," taking the non-movant's evidence as true and drawing inferences in its favor. *Furr v. K-Mart Corp.*, 142 N.C. App. 325, 327, 543 S.E.2d 166, 168 (2001).

17. The moving party "bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579, 573 S.E.2d 118, 124 (2002). If the moving party carries this burden, the responding party "may not rest upon the mere allegations or denials of his pleading[s]," *Khashman v. Khashman*, No. COA16-765, 2017 N.C. App. LEXIS 715, at *15 (N.C. Ct. App. 2017) (unpublished), but must instead "come forward with specific facts establishing the presence of a genuine factual dispute for trial," *Liberty Mut. Ins. Co.*, 356 N.C. at 579, 573 S.E.2d at 124. A "genuine issue" exists when "'it is supported by substantial evidence,' which is that amount of relevant evidence necessary to persuade a reasonable mind to accept a conclusion." *Id.* (citation omitted) (quoting *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002)).

### A. Plaintiff's Motion

18. JS Real Estate seeks summary judgment as to its claim for breach of contract. A party establishes that a breach of contract has occurred when (1) a valid contract exists and (2) a term of the contract is breached. *See Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). Here, the parties agree that the Separation Agreement is a valid contract but disagree over whether any term was breached.

(Mem. in Supp. of Pl.'s Mot. for Partial Summ. J. 10, 12 ["Pl.'s Mem. in Supp."], ECF No. 48; Defs.' Br. in Opp. 8, ECF No. 59.)

19. "When the language of a written contract is plain and unambiguous, the contract must be interpreted as written and the parties are bound by its terms." *Atl. & E. Carolina Ry. Co. v. Wheatly Oil Co.*, 163 N.C. App. 748, 752, 594 S.E.2d 425, 429 (2004). "[H]owever, if the terms employed are subject to more than one reasonable meaning, the interpretation of the contract is a jury question." *Robertson v. Hartman*, 90 N.C. App. 250, 252–53, 368 S.E.2d 199, 200 (1988). Whether a contractual term is ambiguous is a question of law. *See, e.g.*, *Wachovia Bank Nat'l Ass'n v. Superior Constr. Corp.*, 213 N.C. App. 341, 349, 718 S.E.2d 160, 165 (2011).

20. JS Real Estate contends that Defendants breached two related terms of the Separation Agreement. (Pl.'s Mem. in Supp. 12–14.) The first is the parties' "desire to have" the Management Companies "continue their current business affairs." (Separation Agreement ¶ IV.) The second states that "[p]roceeds from such business affairs shall be equally shared by" JS Real Estate and Gee Real Estate. (Separation Agreement ¶ IV.) According to JS Real Estate, this language is "clear and unambiguous": the Management Companies were to "maintain without interruption" their current business affairs, and JS Real Estate and Gee Real Estate "agreed to equally split the money generated from managing the Middletown and Smyrna properties." (Pl.'s Br. in Supp. 11, 13, 14.)

21. The Court disagrees. In the context of the Separation Agreement, it is unclear what the parties meant by the Management Companies' "current business

affairs" and how to "continue" them. Before April 2014 (the date of the Separation Agreement), Gvest Partners performed most asset and property management services for the Middletown and Smyrna properties. (Gee Aff. ¶ 22.) But the Separation Agreement expressly dissolved Gvest Partners. (Separation Agreement p.1.) In other words, the Separation Agreement requires the Management Companies to "continue their current business affairs" while also eliminating the entity that facilitated those business affairs. The surrounding text, which gives some measure of discretion to Gee as manager of the assets, provides no way for the Court to resolve this built-in ambiguity as a matter of law.

22.    JS Real Estate insists that summary judgment is appropriate because, even viewing the evidence in a light most favorable to Defendants, the actions taken by Defendants after April 2014 "fundamentally altered" the Management Companies' affairs. (Pl.'s Br. in Supp. 15.) In his affidavit, Shaw states that "all of the cash flow from the VA properties was equally shared between" JS Real Estate and Gee Real Estate before April 2014 because the money was "invested . . . in Gvest Partners," which "they owned equally." (Shaw Aff. ¶ 6.) JS Real Estate contends that Defendants upset the status quo by replacing Gvest Partners with Gvest Capital (an entity solely owned by Gee). JS Real Estate further asserts that the management fees paid to Gvest Capital decreased or eliminated the cash flow that the Management Companies should have received under their agreements with the property owners. (*See* Shaw Aff. ¶ 8.) As a result, JS Real Estate contends, Defendants "intercepted" the Management Companies' proceeds, and no proceeds

have been distributed to JS Real Estate or Gee Real Estate since April 2014. (Pl.'s Br. in Supp. 12, 14.)

23. The record is not so one-sided. Although Defendants acknowledge that no distributions have been made since Gvest Partners was dissolved, they point to evidence showing that the Management Companies have accumulated roughly $170,000 that is ready for distribution. (*See* Gee Aff. ¶ 29, Ex. D; Broadbooks Aff. ¶¶ 3, 7.) In his affidavit, Gee states JS Real Estate has known about these funds since 2015 yet failed to respond to the notice, thereby delaying disbursement. (*See* Gee Aff. ¶ 29.) Defendants also note that the Management Companies have never made distributions, including during the period before the Separation Agreement. (*See* Gee Aff. ¶ 28.)

24. Furthermore, the Separation Agreement does not expressly prohibit Defendants from engaging Gvest Capital to perform asset and property management services. The decision to replace Gvest Partners with Gvest Capital, and whether it is a breach of the agreement, must be evaluated in light of the pre-April 2014 arrangement with Gvest Partners, the dissolution of Gvest Partners, and the managerial discretion vested in Defendants, among other factors. Defendants have offered evidence that Gvest Capital's fees are not excessive, (*see* Cantrell Aff. ¶¶ 8D–F, ECF No. 60), and that the direct payments received from the property owners are similar to those received by Gvest Partners "on an ad hoc basis" before April 2014, (Gee Aff. ¶ 16; *see also* Gee Aff. ¶ 28). In addition, JS Real Estate acknowledges that "the actual, legitimate costs associated with providing the asset and property

management services" are "appropriate expenses to be paid before distributions." (Pl.'s Reply 7, ECF No. 68.) A jury could reasonably credit Defendants' evidence and conclude that the arrangement with Gvest Capital does not breach the Separation Agreement.

25.     To be sure, Defendants' decision to use the services of an entity controlled by Gee in lieu of a third-party vendor is not immune from criticism by JS Real Estate at trial. So too for the amount of Gvest Capital's fees. Nevertheless, in view of the ambiguity in the contract language and the disputed evidence in the record, it is a jury question whether Defendants' conduct following the dissolution of Gvest Partners is a continuation of the Management Companies' business affairs and whether the proceeds are being equally shared as contemplated by the Separation Agreement. Therefore, the Court denies JS Real Estate's motion.

## B.  Defendants' Motion

26.     Defendants seek summary judgment, first, on JS Real Estate's claims for breach of fiduciary duty and constructive fraud and, second, on its claim for unfair or deceptive trade practices. (Defs.' Mot. for Partial Summ. J.) The Court addresses these arguments in turn.

### 1. Breach of Fiduciary Duty and Constructive Fraud

27.     The claims for breach of fiduciary duty and constructive fraud are premised largely on the same allegations underlying the claim for breach of contract: Defendants' alleged self-dealing in directing asset and property management fees to Gvest Capital, thereby reducing or eliminating proceeds that otherwise would have

been shared with JS Real Estate. Defendants contend that the claims should therefore be dismissed as superfluous because they "are nothing more than different articulations of the breach of contract claim." (Defs.' Br. in Supp. 13, ECF No. 51.)

28. The parties agree that Delaware law governs these claims, which concern the relationships between the members and managers of two Delaware LLCs. (Defs.' Br. in Supp. 10–11; Pl.'s Br. in Opp. 11, ECF No. 56.) Accordingly, the Court applies Delaware law. *See Worley v. Moore*, 2017 NCBC LEXIS 15, at *67 (N.C. Super. Ct. Feb. 28, 2017) (applying Delaware law to claims for breach of fiduciary duty and constructive fraud "under the internal affairs doctrine").

29. Delaware courts stress "the primacy of contract law over fiduciary law in matters involving . . . contractual rights and obligations." *Gale v. Bershad*, No. 15714, 1998 Del. Ch. LEXIS 37, at *23 (Del. Ch. Mar. 3, 1998). As the Delaware Supreme Court has explained, "where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim." *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010). Related fiduciary claims are deemed "superfluous." *Id.* Thus, under Delaware law, "a contractual claim will preclude a fiduciary claim," so long as "the duty sought to be enforced arises from the parties' contractual relationship." *Solow v. Aspect Res., LLC*, No. 20397, 2004 Del. Ch. LEXIS 151, at *4 (Del. Ch. Oct. 19, 2004); *see also Madison Realty Co. v. AG ISA, LLC*, No. 18094, 2001 Del. Ch. LEXIS 37, at *19–20 (Del. Ch. Apr. 17, 2001) (holding dismissal of fiduciary claim appropriate where the alleged wrongdoing was "already addressed by a breach of contract claim").

30.     Defendants interpret this case law broadly.  They contend that, "[u]nder Delaware law, if a claim for breach of contract and breach of fiduciary duty *arise from the same underlying conduct or nucleus of operative facts*, the fiduciary claims are considered 'duplicative' and are subject to dismissal."  (Defs.' Br. in Supp. 12 (emphasis added).)  Thus, they contend, summary judgment is appropriate because JS Real Estate's claims for breach of fiduciary duty and constructive fraud are based on the same conduct as the breach-of-contract claim.  (Defs.' Br. in Supp. 9.)

31.     The Delaware Court of Chancery has rejected this "expansive view." *PT China LLC v. PT Korea LLC*, No. 4456-VCN, 2010 Del. Ch. LEXIS 38, at \*27 (Del. Ch. Feb. 26, 2010).  The question is not "whether the fiduciary and contractual claims are based on the same facts." *Id.*  It is instead "whether there exists an independent basis for the fiduciary duty claims apart from the contractual claims, even if both are related to the same or similar conduct." *Id.*; *see also id.* at \*27 n.34; *McBeth v. Porges*, 171 F. Supp. 3d 216, 232 (S.D.N.Y. 2016).

32.     JS Real Estate's claims satisfy this standard.  The source of Defendants' fiduciary duty is not the Separation Agreement; rather, it arises from Defendants' status as managers of the Management Companies and their relationship with JS Real Estate as one of the companies' members.  As JS Real Estate observes, Delaware law imposes traditional fiduciary duties on the manager of a limited liability company, including the duties of loyalty and care owed to the company's members. *See CelestialRX Investments, LLC v. Krivulka*, No. 11733-VCG, 2017 Del. Ch. LEXIS 22, at \*43–44 & n.223 (Del. Ch. Jan. 31, 2017); *see also* Del. Code Ann. tit. 6, § 18-

1104 ("In any case not provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties and the law merchant, shall govern."). These traditional duties exist so long as "the limited liability company agreement does not opt out of fiduciary duties." *McKenna v. Singer*, No. 11371-VCMR, 2017 Del. Ch. LEXIS 138, at *41 (Del. Ch. July 31, 2017). Here, the record contains no indication that the parties "contractually limited the fiduciary duties they owed to each other" in the operating agreements for the Management Companies. *PT China*, 2010 Del. Ch. LEXIS 38, at *31.

33. Accordingly, JS Real Estate has offered sufficient evidence of an independent, non-contractual basis for its claims for breach of fiduciary duty and constructive fraud. The Court denies Defendants' motion for summary judgment as to these claims.

2. Section 75-1.1

34. Section 75-1.1 of the North Carolina General Statutes declares "unfair or deceptive acts or practices in or affecting commerce" unlawful. To prevail on a section 75-1.1 claim, a plaintiff must show that "(1) [the] defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). The parties' dispute centers on the second element: whether Defendants' alleged acts were in or affecting commerce. (Defs.' Br. in Supp. 10.)

35. Commerce is defined to include "all business activities." N.C. Gen. Stat. § 75-1.1(b). This broad phrase "connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized." *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 594, 403 S.E.2d 483, 493 (1991). It is not intended "to regulate purely internal business operations." *White v. Thompson*, 364 N.C. 47, 48, 691 S.E.2d 676, 676 (2010). Put another way, the General Assembly drafted section 75-1.1 to be broad enough "to regulate a business's regular interactions with other market participants" but not so broad as to capture conduct "solely related to the internal operations" of a business. *Id.* at 51–52, 691 S.E.2d at 679.

36. Two binding appellate decisions are directly relevant here. In *Sara Lee Corp. v. Carter*, the North Carolina Supreme Court held that an employee violated section 75-1.1 by "engag[ing] in self-dealing business activities wherein he sold computer parts and services to his employer from companies owned by him." 351 N.C. 27, 32–33, 519 S.E.2d 308, 311 (1999). According to the Supreme Court, the employee and his employer "clearly engaged in buyer-seller relations in a business setting." *Id.* at 33, 519 S.E.2d at 312. On that basis, the Court expressly held that the self-dealing transactions were in or affecting commerce. *See id.*

37. A decade later, the Supreme Court revisited the subject in *White*, a case arising from a dispute between business partners. *See* 364 N.C. at 48, 691 S.E.2d at 677. The plaintiffs alleged, among other things, that the defendant formed a separate

business and diverted work to his new business and away from the partnership. *See id.* at 50, 691 S.E.2d at 678. The Court concluded that the defendant "breached his fiduciary duty as a partner in this single market participant" and therefore "unfairly and deceptively interacted only with his partners." *Id.* at 53–54, 691 S.E.2d at 680. This conduct, which "occurred completely within" the partnership, was not in or affecting commerce. *Id.* at 54, 691 S.E.2d at 680.

38.  Defendants, relying on *White*, argue that their alleged actions "are all encompassed within the rubric of the management and ownership of" the Management Companies. (Defs.' Reply 9, ECF No. 70; *see also* Defs.' Br in Supp. 14–15, 17.) Although JS Real Estate "may have claims relating to the division of company proceeds," Defendants contend, such claims "arise from the intra-company relationship between Plaintiff and the Defendants." (Defs.' Br. in Supp. 18.)

39.  JS Real Estate counters that *Sara Lee* controls because Defendants' "misconduct involved commercial interactions with their outside business, Gvest Capital, which is a separate market participant from" the Management Companies. (Pl.'s Br. in Opp. 15.) JS Real Estate further contends that some of Defendants' wrongdoing—specifically, accepting a reimbursement for an engineer that Gvest Capital never provided—affected other market participants, including the property owners and the VA. (*See* Pl.'s Br. in Opp. 15–16.)

40.  The Court concludes that *White* controls and compels summary judgment in Defendants' favor. By its nature, this dispute does not concern the regular interactions of separate market participants. Rather, it is a dispute between

members of the Management Companies over the companies' internal management and the members' right to receive distributions—that is, whether Defendants deprived JS Real Estate of an appropriate share of the proceeds received by (or that should have been received by) the Management Companies. (*See* Compl. ¶¶ 90, 99.) Accordingly, the unfairness of Defendants' conduct, if any, "occurred in interaction among the" members of the LLCs. *White*, 364 N.C. at 53, 691 S.E.2d at 680.

41. The fact that Defendants channeled management fees to Gvest Capital, an outside entity, does not change the fundamental character of the dispute. These alleged actions, even if true, "are more properly classified as the misappropriation of corporate funds within a single entity rather than commercial transactions between separate market participants 'in or affecting commerce.'" *Alexander v. Alexander*, 792 S.E.2d 901, 905 (N.C. Ct. App. 2016). Indeed, *White* itself involved a partner's breach of fiduciary duty by diverting work to his own business and away from the partnership. *See* 364 N.C. at 53, 691 S.E.2d at 680; *see also RCJJ, LLC v. RCWIL Enters., LLC*, 2016 NCBC LEXIS 46, at *50 (N.C. Super. Ct. June 20, 2016) ("In *White*, the defendant's diversion of work opportunities and payments occurred after the defendant had formed and was working on behalf of his new, competing business.").

42. Likewise, the "tangential involvement" of the property owners and the VA also does not mean that Defendants' acts were in or affecting commerce. *Polyquest, Inc. v. Vestar Corp., LLC*, No. 7:13-CV-23-F, 2014 U.S. Dist. LEXIS 14905, at *35 (E.D.N.C. Feb. 6, 2014). "The Supreme Court's refusal in *White* to allow indirect

involvement of other market participants to trigger liability under Section 75-1.1 forecloses" that argument. *Powell v. Dunn*, 2014 NCBC LEXIS 3, at *10, 11 (N.C. Super. Ct. Jan. 28, 2014) (granting motion to dismiss).

43. Thus, viewing the evidence in a light most favorable to JS Real Estate, the section 75-1.1 claim does not concern a dispute between market participants but instead a dispute between the "co-owners of" the Management Companies. *McKee v. James*, 2014 NCBC LEXIS 74, at *42 (N.C. Super. Ct. Dec. 31, 2014) (granting summary judgment); *see also Chisum v. Campagna*, 2017 NCBC LEXIS 102, at *35–37 (N.C. Super. Ct. Nov. 7, 2017) (granting motion to dismiss). Defendants are therefore entitled to summary judgment.

### III.
### CONCLUSION

44. For these reasons, the Court **DENIES** JS Real Estate's motion.

45. The Court **GRANTS in part** Defendants' motion. Defendants are entitled to judgment as a matter of law that they did not violate section 75-1.1. In all other respects, the motion is **DENIED**.

This the 9th day of November, 2017.

/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
for Complex Business Cases