Wheeler v. Wheeler, 2018 NCBC 37.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

CHRISTOPHER GRAY WHEELER,

Plaintiff,

v.

JOSEPH GRAY WHEELER; SCOTT
A. MOE; and YALE CAROLINAS,
INC. d/b/a WHEELER MATERIAL
HANDLING, INC.,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 16248

**ORDER AND OPINION ON
DEFENDANT'S MOTION TO
DISMISS**

1.     **THIS MATTER** is before the Court on Defendant Joseph Gray Wheeler's ("Joseph") partial motion to dismiss (the "Motion"). For the reasons set forth below, the Court **GRANTS** the Motion.

*Cadwalader, Wickersham & Taft LLP, by Jonathan M. Watkins, Nathan M. Bull, and Hyungjoo Han, for Plaintiff.*

*Nexsen Pruet, PLLC, by James C. Smith and Kathleen D.B. Burchette, for Defendant Joseph Gray Wheeler.*

*Robinson Bradshaw & Hinson, P.A., by John R. Wester and D. Blaine Sanders, for Defendants Scott A. Moe and Yale Carolinas, Inc.*

Robinson, Judge.

## I.     FACTUAL BACKGROUND

2.     The Court does not make findings of fact on Joseph's Motion; rather, the Court recites the following factual allegations of the complaint that are relevant and necessary to the Court's determination of the Motion.

3. Plaintiff Christopher Gray Wheeler ("Plaintiff" or "Gray") owns a 33.45% interest in Defendant Yale Carolinas, Inc. ("YCI"). (Am. Compl. ¶ 3, ECF No. 38.)

4. Joseph, Gray's father, owns a 51.19% interest in YCI. (Am. Compl. ¶ 4.) Joseph is also YCI's chief executive officer and the chairman of YCI's board of directors. (Am. Compl. ¶ 4.)

5. Defendant Scott A. Moe ("Scott") worked at YCI as an account manager from 1989 to 1994 and became YCI's vice president of sales in 2003. (Am. Compl. ¶ 5.) Scott owns a 15.36% interest in YCI. (Am. Compl. ¶ 5.)

6. YCI is a North Carolina corporation with its principal place of business in Charlotte, North Carolina. (Am. Compl. ¶ 6.) YCI sells, rents, services, and provides parts for material-handling equipment such as forklifts, scissor lifts, personnel carriers, fuel cells, batteries and chargers, and refueling systems. (Am. Compl. ¶ 6.) YCI operates under a renewable dealer marketing agreement with its primary supplier, Hyster-Yale Materials Handling, Inc. (Am. Compl. ¶ 6.)

7. In early 2004, Joseph recruited Gray to join YCI. (Am. Compl. ¶ 17.) Gray alleges that in order to persuade Gray to accept a position at YCI, Joseph promised Gray: (1) that YCI had been, and would continue to be, operated like a public company with the transparency and professionalism that accompanies a properly run public company; (2) a significant equity stake in YCI; (3) an apprenticeship to take over full day-to-day decision-making authority and full profit-and-loss responsibility; (4) transition of ownership of the business to Gray; and (5) that equity buyouts would be done fairly and at a near-to-market-value multiple. (Am. Compl. ¶¶ 17−18.)

8. Gray alleges that these promises induced Gray to accept Joseph's offer. (Am. Compl. ¶ 18.) Gray began working at YCI as its controller and chief financial officer on May 1, 2004. (Am. Compl. ¶¶ 18–19.)

9. In 2005, Joseph promoted Gray to vice president of operations, and Joseph went into semi-retirement. (Am. Compl. ¶ 19.)

10. In 2009, Joseph promoted Gray to president. (Am. Compl. ¶ 20.)

11. In late 2011, Joseph approached Gray and Scott with a plan pursuant to which Joseph would retire approximately 17% of his 68% interest in YCI to reduce his interest to just over 50%. (Am. Compl. ¶ 25.) Gray alleges that Joseph told Gray and Scott that the purpose of retiring a portion of Joseph's interest was to fund Joseph's retirement while at the same time increasing the ownership interests of both Gray and Scott without requiring additional capital outlay. (Am. Compl. ¶ 25.) Under Joseph's plan, YCI would take on a long-term note that would compensate Joseph immediately for his reduction in shares. (Am. Compl. ¶ 26.) Joseph decided that to determine the value of his shares, YCI would be valued at 4.5 times EBITDA (earnings before interest, taxes, depreciation, and amortization) minus interest-bearing debt. (Am. Compl. ¶ 27.) Gray alleges that, using YCI's then-current financial metrics, the valuation methodology proposed by Joseph would value the company at approximately $16.7 million. (Am. Compl. ¶ 14.) Gray alleges that YCI's commercial bankers at PNC Bank indicated that $16.7 million was a reasonable market value for YCI as an ongoing enterprise. (Am. Compl. ¶ 27.)

12.     Based on a $16.7 million valuation, Gray calculated that the amount of consideration to be paid to Joseph for the retirement of his shares and resulting recapitalization would be about $2.82 million.  (Am. Compl. ¶ 28.)  Gray alleges that Joseph, however, claimed that as the controlling shareholder, Joseph was entitled to approximately $5.7 million—more than double the $2.82 million that would be due based on the 4.5 times EBITDA minus interest-bearing debt valuation—in exchange for retiring a 17% interest in YCI.  (Am. Compl. ¶ 29.)  Joseph concluded that $5.7 million was the appropriate payment by dividing the EBITDA minus interest-bearing debt enterprise value by the number of shares outstanding to arrive at a price per share, which Joseph then multiplied by the number of shares Joseph was retiring.  (Am. Compl. ¶ 29.)   Gray contends that Joseph's methodology yielded an unreasonable valuation of Joseph's 17% interest and a corresponding unreasonable $33.75 million valuation of the company, which was a departure from values assigned to other departing shareholders' shares in the company.  (Am. Compl. ¶¶ 30, 44.)

13.     Nevertheless, Gray contends that Joseph threatened that if Gray did not complete the transaction on Joseph's terms, then Joseph would revoke his promise that Gray would be the majority shareholder in YCI within a reasonable timeframe. (Am. Compl. ¶ 33.)

14.     As a result, the recapitalization was completed on Joseph's terms, but with a number of covenants restricting company borrowing and prohibiting non-tax dividends from being paid through the S corporation until the note was paid down from $5.7 million to under $3 million.  (Am. Compl. ¶ 36.)

15. In 2012, Joseph went into full retirement. (Am. Compl. ¶ 4.)

16. Despite Joseph's retirement, Joseph has insisted on retaining his title as CEO and continues to receive his $195,000 salary, insurance, 401(k) match, and other benefits such as a $650 per month car allowance and unlimited use of a fuel card. (Am. Compl. ¶ 53.)

17. In or around August 2015, Gray asked Joseph to make good on commitments to transfer majority ownership of YCI and revise Joseph's compensation in order to reflect his retirement. (Am. Compl. ¶ 54.) Joseph refused, asserting that he would not at any point relinquish his controlling position in YCI. (Am. Compl. ¶ 54.)

18. In November 2015, Gray made another request to Joseph that Joseph allow YCI to reduce his compensation package to one that reflected his retirement, was comparable to his retired peers, and was fair to those managers who continued to work for YCI. (Am. Compl. ¶ 55.) Joseph refused to discuss the matter. (Am. Compl. ¶ 55.)

19. By August 2016, Gray decided that it was time to explore a transition out of YCI. (Am. Compl. ¶ 56.) Two weeks later, Gray and Scott agreed that Scott was capable of, and interested in, running YCI as president, and that Gray would resign as president of the company but continue for eighteen months as a full-time advisor to Scott and also continue serving as a member of the board of directors. (Am. Compl. ¶ 57.)

20. In November 2016, Gray formally notified Joseph and Scott of his desire to transition out of the company. (Am. Compl. ¶ 58.) Gray offered a twelve-to-eighteen month transition period and various options as to Gray's role in the company after Scott assumed position as president. (Am. Compl. ¶ 58.)

21. Thereafter, Gray alleges that Joseph embarked on a scheme to immediately oust Gray from YCI and to force Gray to relinquish his shares at a fraction of their fair value. (Am. Compl. ¶ 59.) In December 2016, Joseph e-mailed Gray and Scott asserting that YCI's value was approximately $10.7 million. (Am. Compl. ¶ 59.) Although Joseph eventually retreated from that unreasonable valuation, Joseph then caused YCI to accept Gray's resignation—even though Gray had never tendered any resignation—to attempt to force Gray to sell his shares back to YCI at book value paid out over the course of six years. (Am. Compl. ¶ 60.) Gray contends that this is an unfairly low valuation that would result in a windfall to the other shareholders. (Am. Compl. ¶ 60.)

22. On April 5, 2017, Joseph misrepresented to YCI's outside certified public accountant that Gray's shares had been purchased by YCI effective March 31, 2017, caused the board to adopt minutes that purport to accept Gray's never-given resignation, and caused YCI to cease compensating Gray despite that Gray remained an employee. (Am. Compl. ¶ 66.)

23. On November 14, 2017, YCI asserted for the first time that it was treating Gray's cessation of employment, based on YCI's acceptance of Gray's resignation in April 2017, as termination for cause on the erroneous basis that Gray secretly

increased his compensation while serving as president. (Am. Compl. ¶ 72.) Gray contends that Joseph causing YCI to retroactively declare Gray's cessation of employment a termination for cause is an attempt to avoid paying Gray the shareholder distributions to which he is entitled and to force a buy-out of Gray's shares at an unreasonable value. (Am. Compl. ¶ 72.)

24. At the end of 2017, Joseph was approached by LiftOne, YCI's chief competitor, regarding its interest in acquiring YCI through an all-cash transaction at an attractive valuation. (Am. Compl. ¶ 73.) Joseph did not inform Gray of LiftOne's proposal. (Am. Compl. ¶ 73.) Instead, Joseph informed LiftOne that YCI would not be sold at this time. (Am. Compl. ¶ 73.)

## II.  PROCEDURAL HISTORY

25. Gray initiated this action on September 1, 2017 by filing his Complaint. (ECF No. 1.) Gray filed his Amended Complaint on January 18, 2018 seeking judicial dissolution of YCI and asserting claims against Joseph for breach of fiduciary duty, constructive fraud, and unfair and deceptive trade practices ("UDTP"). (Am. Compl. 38−39, 41−42.)

26. This action was designated as a mandatory complex business case by order of the Chief Justice of the Supreme Court of North Carolina dated September 5, 2017, (ECF No. 3), and assigned to the Honorable Louise A. Bledsoe, III by order of the Chief Business Court Judge dated September 6, 2017, (ECF No. 2). This case was later reassigned to the undersigned by order dated November 8, 2017. (ECF No. 15.)

27. On February 16, 2018, Joseph filed the Motion seeking dismissal of Gray's UDTP claim. (ECF No. 40.)

28. The Motion has been fully briefed. The Court dispenses with the necessity of conducting a hearing on the Motion as permitted by Rule 7.4 of the General Rules of Practice and Procedure for the North Carolina Business Court. The Motion is now ripe for resolution.

### III. LEGAL STANDARD

29. In ruling on a motion to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure, the Court reviews the allegations of the Amended Complaint in the light most favorable to Plaintiff. The Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory." *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). The Court construes the Amended Complaint liberally and accepts all factual allegations as true. *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009). The Court is not, however, required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005). The Court can also ignore a party's legal conclusions set forth in its pleading. *McCrann v. Pinehurst, LLC*, 225 N.C. App. 368, 377, 737 S.E.2d 771, 777 (2013).

30.     Dismissal of a claim pursuant to Rule 12(b)(6) is proper "(1) when the complaint on its face reveals that no law supports [the] claim; (2) when the complaint reveals on its face the absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the complaint necessarily defeats the . . . claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985); *see also Jackson v. Bumgardner*, 318 N.C. 172, 175, 347 S.E.2d 743, 745 (1986). Otherwise, "a complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970) (emphasis omitted).

## IV.     ANALYSIS

31.     Gray alleges that Joseph engaged in UDTP in violation of N.C. Gen. Stat. § 75-1.1 by abusing his position as a majority shareholder to (1) engage in self-dealing by forcing YCI to purchase 17% of Joseph's interest in the company at an unreasonably high price, (2) commit corporate waste and engage in self-dealing by forcing YCI to pay Joseph a salary of $195,000 after Joseph had retired, (3) mislead YCI's auditor by asserting that Gray's shares had been purchased effective March 31, 2017, (4) purport to accept a resignation by Gray as president, (5) retroactively attempt to terminate Gray for cause, (6) put YCI at risk by violating the Hyster-Yale Code of Conduct for Business Partners, and (7) fail to inform Gray of LiftOne's proposal to acquire YCI. (Am. Compl. ¶ 91.)

32.     Joseph moves to dismiss Gray's UDTP claim, contending that the alleged conduct occurred solely within a single market participant and, therefore, was not "in

or affecting commerce." (Mem. Supp. Def. Joseph's Mot. Dismiss Claim for Unfair & Deceptive Trade Practices 6–9, ECF No. 41.)

33. In order to state a UDTP claim, Gray must allege (1) an unfair or deceptive act or practice, (2) in or affecting commerce, (3) which proximately caused injury to Gray. *Belcher v. Fleetwood Enters., Inc.*, 162 N.C. App. 80, 85, 590 S.E.2d 15, 18 (2004). "'[C]ommerce' includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession." N.C. Gen. Stat. § 75-1.1(b). "Although this statutory definition of commerce is expansive, [section 75-1.1] is not intended to apply to all wrongs in a business setting." *Alexander v. Alexander*, 792 S.E.2d 901, 904 (N.C. Ct. App. 2016) (quoting *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 593, 403 S.E.2d 483, 492 (1991)). "'Business activities' is a term which connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized." *HAJMM Co.*, 328 N.C. at 594, 403 S.E.2d at 493. As further explained by our Supreme Court, section 75-1.1 regulates "two types of interactions in the business setting: (1) interactions between businesses, and (2) interactions between businesses and consumers." *White v. Thompson*, 364 N.C. 47, 52, 691 S.E.2d 676, 679 (2010). Section 75-1.1 does not apply to the internal conduct of individuals within a single market participant. *Alexander*, 792 S.E.2d at 904. Rather, "the General Assembly intended [section 75-1.1] to apply to interactions between market participants. As a result, any unfair or deceptive conduct contained solely within a

single business is not covered by [section 75-1.1]." *White*, 364 N.C. at 53, 691 S.E.2d at 680.

34.     The Court, taking the factual allegations of the Amended Complaint as true, concludes that Gray has failed to allege that Joseph's alleged unfair or deceptive conduct was in or affecting commerce. Joseph's alleged conduct in forcing YCI to purchase his interest at an unreasonably high price, forcing YCI to pay Joseph his $195,000 salary after he retired, purporting to accept Gray's resignation as YCI's president, and retroactively attempting to terminate Gray for cause, plainly constitutes conduct contained within a single business, YCI, and is therefore not in or affecting commerce.

35.     The remaining allegations that Joseph misled YCI's auditor by asserting that Gray's shares had been purchased, violated the Hyster-Yale Code of Conduct and thus put YCI's relationship with its principal supplier at risk, and failed to inform Gray of LiftOne's proposal to acquire YCI, also allege unfair or deceptive conduct that occurred only within YCI. "[W]hen the unfair or deceptive conduct alleged only affects relationships within a single business or market participant, and not dealings with other market participants, that conduct is not 'in or affecting' commerce within the section of section 75-1.1, even if other market participants may be indirectly involved in the unfair or deceptive acts." *Powell v. Dunn*, 2014 NCBC LEXIS 3, at *9 (N.C. Super. Ct. Jan. 28, 2014).

36.     The fact that YCI's auditor, YCI's principal supplier, and LiftOne are tangentially involved does not make Joseph's conduct in or affecting commerce.

Rather, this is a dispute between the shareholders of a corporation regarding its internal management and the shareholders' right to fair value for their ownership interest. "Our courts have recognized similar disputes for what they really are: intra-company feuds about internal operations." *Potts v. KEL, LLC*, 2018 NCBC LEXIS 24, at *14 (N.C. Super. Ct. Mar. 27, 2018).

37. As the alleged conduct concerns the internal operations of a single business, the Amended Complaint fails to state a UDTP claim and, therefore, such claim is dismissed with prejudice.

## V. CONCLUSION

38. For the foregoing reasons, the Court **GRANTS** the Motion and **DISMISSES with prejudice** Plaintiff's UDTP claim.

**SO ORDERED**, this the 25th day of April, 2018.

/s/ Michael L. Robinson

Michael L. Robinson
Special Superior Court Judge
   for Complex Business Cases