Poluka v. Willette, 2021 NCBC 74.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

JAYSON M. POLUKA, individually
and derivatively on behalf of
CAPISHE, LLC,

               Plaintiff,

v.

BRUCE R. WILLETTE and BR
VENTURES, INC.,

               Defendants,

and

CAPISHE, LLC,

               Nominal
               Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS 10099

**ORDER AND OPINION ON MOTION
TO DISMISS**

THIS MATTER comes before the Court on Defendants Bruce R. Willette and BR Ventures, Inc.'s partial Motion to Dismiss. (ECF No. 12.)

THE COURT, having considered the motion, the briefs of the parties, the applicable law, the arguments of counsel, and all applicable matters of record, **CONCLUDES**, for the reasons set forth below, that Willette and BR Ventures, Inc.'s motion should be **GRANTED**.

*Forrest Firm, P.C., by Keith E. Richardson and Andrew R. Jones, for Plaintiff Jayson M. Poluka.*

*Higgins & Owens, PLLC, by Sara W. Higgins, for Defendants Bruce R. Willette and BR Ventures, Inc.*

*Erwin, Bishop, Capitano & Moss, P.A., by Joseph W. Moss Jr., for Nominal Defendant Capishe, LLC.*

Davis, Judge.

## INTRODUCTION

1. This action involves a dispute between members of a limited liability company ("LLC") organized for the purpose of establishing and operating a restaurant in Charlotte, North Carolina. The plaintiff, Jayson M. Poluka, has asserted a number of claims against another member of the LLC, Bruce R. Willette, and a separate entity formed by Willette called BR Ventures, Inc. based on allegations of self-dealing and other misconduct by Willette. One of these claims is a cause of action for a violation of the Unfair and Deceptive Trade Practices Act ("UDTPA") pursuant to Chapter 75 of the North Carolina General Statutes. In the present motion, Defendants have moved to dismiss this claim on the sole ground that the alleged misconduct was not "in or affecting commerce" as required in order to state a valid claim under the UDTPA.

## FACTUAL AND PROCEDURAL BACKGROUND

2. The Court does not make findings of fact on motions to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure and instead recites those facts contained in the Complaint (and in documents attached to, referred to, or incorporated by reference in the Complaint) that are relevant to the Court's determination of the Motion. *See, e.g., Concrete Serv. Corp. v. Inv'rs Grp., Inc.*, 79 N.C. App. 678, 681 (1986); *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2017 NCBC LEXIS 60, at *11 (N.C. Super. Ct. July 12, 2017). Accordingly, the following facts—which bear on the pending Motion to Dismiss—are drawn from Poluka's Complaint.

3. This case involves a dispute between two members of Capishe, LLC ("Capishe"). Poluka owns a 16% membership interest in Capishe. (Complaint, ECF No. 3, at ¶ 1.)

4. Willette is a manager and a 52% member of Capishe. (*Id.* at ¶ 3.) Willette is also the president, secretary, and registered agent of BR Ventures, Inc. (*Id.*) BR Ventures is "wholly-owned by Willette" and is totally under his control. (*Id.* at ¶¶ 3–4.)

5. The other members of Capishe are Servet Guvenc and Silvia Maria Vargas Ramirez, who each own a 16% membership interest in the LLC. (*Id.* at ¶ 5.) Guvenc and Ramirez are not parties to this action.

6. Capishe is a "fast-casual" Italian restaurant located in the Dilworth neighborhood of Charlotte. Capishe previously operated at an additional location in the Southpark area of Charlotte that has since closed. (*Id.* at ¶¶ 9–11.)

7. The origins of Capishe date back to similar, but separate, Italian restaurant concepts developed by Poluka and Willette. In 2016 and 2017, Poluka began developing a "fast casual Italian restaurant" in Waxhaw, North Carolina. (*Id.* at ¶ 13.) Poluka formed an entity called Enzo Pizzaiolo Group, LLC to facilitate this new project. (*Id.*) Poluka found a site for the new restaurant and hired Guvenc and Ramirez, experienced restaurant operators, to serve as chefs and managers. (*Id.* at ¶¶ 14–15.)

8. In March 2017, a design architect who Poluka had hired to assist him in launching Enzo Pizzaiolo introduced Poluka to Willette. (*Id.* at ¶ 17.) Willette had

prior experience "launching and growing restaurant businesses" and claimed to possess a membership interest in Amélie's French Bakery & Café in Charlotte. (*Id.* at ¶ 18.)

9. On 19 May 2017, Poluka sent Willette "a business partnership proposal between Poluka and his team (including Guvenc and Ramirez), and Willette, regarding their combined fast-casual Italian restaurant pursuit." (*Id.* at ¶ 21.)

10. In summer 2017, Poluka and Willette began touring commercial real estate spaces in the Dilworth neighborhood and selected the location for what would ultimately become Capishe's Dilworth restaurant. (*Id.* at ¶ 23.)

11. Around 14 November 2017, Articles of Organization for Capishe were filed with the North Carolina Secretary of State. (*Id.* at ¶ 25.) Poluka was not aware of the filing until August 2018. (*Id.*)

12. After an extended period of negotiations, Willette, Poluka, Guvenc, and Ramirez executed an Operating Agreement for Capishe on 4 December 2018. (*Id.* at ¶¶ 26–30.) The Operating Agreement stated that all members would also be managers. (*Id.* at ¶ 33.)

13. Capishe opened its Dilworth location on 17 December 2018. (*Id.* at ¶ 31.) However, tensions quickly arose between Poluka and Willette regarding the management of the business. (*Id.* at ¶ 54.)

14. At some point after the opening of the Dilworth restaurant, Willette falsely accused Poluka of misappropriating Capishe funds. Poluka had temporarily placed funds received from Capishe into his own personal bank account because

Willette had refused to provide Poluka with Capishe's account information. (*Id.* at ¶¶ 54–55.) When Willette did provide Poluka with the Capishe account information, "Poluka promptly transferred all . . . funds derived from Capishe's revenue sales to Capishe's bank account." (*Id.* at ¶ 56.)

15.     Despite the resolution of the bank account dispute, "Willette accused Poluka of theft, making it plain that Willette was simply fabricating lies about Poluka to begin ousting Poluka from the management and control of Capishe." (*Id.* at ¶ 57.)

16.     On or about 18 April 2018, BR Ventures filed a trademark application with the United States Patent and Trademark Office ("USPTO") in which it sought to register the word "CAPISHE" as a trademark ("the CAPISHE trademark"). (*Id.* at ¶ 34.) In a submission to the USPTO, BR Ventures asserted that it used the CAPISHE trademark commercially. (*Id.* at ¶ 35.) On or about 21 May 2019, the USPTO registered the CAPISHE trademark, listing BR Ventures as the owner of the trademark. (*Id.* at ¶ 36.) This occurred despite the fact that Capishe—not BR Ventures—has been in full control of the CAPISHE trademark since the opening of the Dilworth restaurant. (*Id.* at ¶ 40.) BR Ventures has neither possessed any ownership over the CAPISHE trademark, used it commercially, nor exercised any control over the goods and services offered using the CAPISHE trademark. (*Id.* at ¶ 43.)

17.     On 29 April 2019, Poluka, through counsel, sent a letter demanding that "the ownership records with the USPTO be updated to reflect Capishe as the correct owner" of the CAPISHE trademark. (*Id.* at ¶ 45.) On 17 May 2019, counsel for

Willette and Capishe responded by rejecting Poluka's demand. (*Id*. at ¶ 46.) A similar demand was made and rejected again in July 2019, August 2019, October 2019, and March 2021. (*Id*. at ¶¶ 47–49.) As of the present date, BR Ventures continues to be the registered owner of the CAPISHE trademark. (*Id*. at ¶ 50.)

18. Additionally, Willette unilaterally amended the Capishe Operating Agreement on or about 21 August 2019. (*Id*. at ¶ 60.) The Operating Agreement was amended to (1) remove Poluka, Guvenc, and Ramirez as managers and instead make the manager electable by a majority vote of Capishe membership interests; (2) allow the manager to unilaterally make a "capital call" to all members if demanded by a majority of membership interests; (3) create a probationary member status for refusal to make required capital calls; and (4) add new definitions of what would constitute a "material breach" of the Operating Agreement by Capishe members. (*Id*. at ¶¶ 33, 61.) Willette made these additions without the required unanimous consent needed under the prior Operating Agreement to add the capital call and probationary membership provisions. (*Id*. at ¶ 63.) Based on his status as a majority owner of Capishe, Willette proceeded to elect himself as the sole manager of Capishe. (*Id*. at ¶ 62.)

19. Following these amendments, a meeting of the Capishe members was held on 4 February 2020. (*Id*. at ¶ 65.) At this meeting, Poluka confronted Willette regarding his failure to inform Poluka of the plan to open a Capishe location in Southpark. (*Id*.) Willette responded that Poluka "did not have a reason to know about the launch of the Southpark location." (*Id*.)

20.     Willette organized an emergency meeting of the Capishe members on 26 March 2020, where he articulated the need for a capital call from the members for a total of $100,000.  (*Id.* at ¶ 66.)  Willette and Ramirez voted for the capital call, but Poluka and Guvenc voted against it.  (*Id.*)

21.     Following this meeting, Poluka hired a forensic accountant to examine Capishe's financial books and records.  (*Id.* at ¶ 67.)  The audit revealed that "since at least November of 2018, Willette ha[d] engaged in a pattern of self-dealing, including, but not limited to, actions to benefit his wife . . . and his wholly-owned company, BR Ventures, at the expense of Capishe."  (*Id.* at ¶ 68.)

22.     The accounting revealed the following improper payments made from Capishe toward Willette, his wife, and Willette-affiliated entities: (1) monthly payments made to Willette for an officer salary despite the fact that the other members did not receive any officer salary; (2) payments of at least $2,000 per month to Ms. Willette for an advertising and marketing salary; (3) monthly auto payments for use of personal vehicles owned by Willette or Ms. Willette; (4) distributions made for Willette's personal attorneys' fees relating to the present dispute; (5) a $3,000 payment to Willette that was not for a legitimate business expense; and (6) a $151,000 payment made to BR Ventures.  (*Id.* at ¶¶ 68–79.)

23.     Willette also funneled Capishe operating expenses through BR Ventures without any legitimate business need to do so.  (*Id.* at ¶ 77.)

24. On 19 March 2021, the landlord of the Capishe Southpark location filed a small claims action against Capishe for failure to pay any rent on the property. (*Id.* at ¶ 80.)

25. On 29 April 2019, Poluka demanded that the company give him access to Capishe's books and records and take action to have the trademark registration changed to have Capishe (rather than BR Ventures) listed as the proper owner of the CAPISHE trademark. (*Id.* at ¶ 83.) On 17 May 2019, Willette and Capishe rejected these demands but gave Poluka limited access to Capishe's finances through a QuickBooks account. (*Id.* at ¶ 84.)

26. On 29 July 2019, Capishe sent another demand to Willette and Capishe to assign the CAPISHE trademark from BR Ventures to Capishe. (*Id.* at ¶ 85.) On 22 August 2019, Willette and Capishe rejected this demand. (*Id.* at ¶ 86.)

27. On 4 October 2019, Poluka sent a demand to Capishe and Willette that Capishe take action regarding "certain wrongful actions, omissions, and breaches of fiduciary duty, including, but not limited to, Willette's control of Capishe, Willette's unilateral amendment of the Operating Agreement and removal of the other Members as Managers, misappropriation of Capishe's funds, misappropriation of the Trademark, and failure to provide Poluka with access to Capishe's books and records[.]" (*Id.* at ¶ 87.) On 11 October 2019, Willette and Capishe rejected these demands. (*Id.* at ¶ 88.)

28. On 22 March 2021, Poluka sent an additional demand to Willette and Capishe

identifying the Self-Dealing transactions benefiting Willette, Ms. Willette, and BR Ventures, and demanding substantiation of the same as commercially reasonable and for legitimate business expenses or needs, and renewing his previous demands that Capishe take action against Willette and BR Ventures regarding Willette's control of Capishe and misappropriate [sic] of the Trademark[.]

(*Id*. at ¶ 89.)

29. On 7 April 2021, this demand was likewise rejected by Willette and Capishe. (*Id*. at ¶ 90.)

30. Poluka filed the present action in Superior Court, Mecklenburg County, on 29 June 2021 against Willette and BR Ventures, also naming Capishe, LLC as a Nominal Defendant. In his Complaint, Poluka asserts individual and derivative claims for breach of fiduciary duty against Willette, individual and derivative claims for constructive fraud against Willette, and a claim for unfair and deceptive trade practices ("UDTP") against Willette and BR Ventures. (*Id*. at ¶¶ 91–132.) Poluka, individually, also seeks a declaratory judgment that Willette's capital contribution amendment to the Capishe Operating Agreement was invalid. (*Id*. at ¶ 138.) Poluka further asserts a derivative claim seeking a declaratory judgment establishing that Capishe—not BR Ventures—is the rightful owner of the CAPISHE trademark. (*Id*. at ¶ 143.) Finally, Poluka seeks an injunction ordering BR Ventures to assign the CAPISHE trademark to Capishe. (*Id*. at ¶ 147.)

31. On 9 August 2021, this case was designated a mandatory complex business case. (ECF Nos. 1, 2.)

32.    On 8 September 2021, Willette and BR Ventures filed a partial Motion to Dismiss pursuant to Rule 12(b)(6).  (ECF No. 12.)  In their motion, Willette and BR Ventures seek dismissal solely as to Poluka's claim for UDTP.  (*Id.*)

33.    This matter came before the Court for a hearing on 27 October 2021. The motion is now ripe for decision.

## LEGAL STANDARD

34.    A motion to dismiss pursuant to Rule 12(b)(6) "tests the legal sufficiency of the complaint." *Concrete Serv. Corp.*, 79 N.C. App. at 681.  The Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670 (1987) (cleaned up).  In deciding a Rule 12(b)(6) motion to dismiss, the Court construes the complaint liberally and accepts all well-pleaded factual allegations as true. *Krawiec v. Manly*, 370 N.C. 602, 606 (2018); *Laster v. Francis*, 199 N.C. App. 572, 577 (2009).  The Court, however, is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274 (2005) (cleaned up).  Furthermore, the Court "can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Moch v. A.M. Pappas & Assocs., LLC*, 251 N.C. App. 198, 206 (2016) (cleaned up).  The Court may consider any such

attached or incorporated documents without converting the Rule 12(b)(6) motion into a motion for summary judgment. *Id.*

35. "It is well-established that dismissal pursuant to Rule 12(b)(6) is proper when (1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (cleaned up).

## ANALYSIS

36. Chapter 75 of the North Carolina General Statutes provides, in pertinent part, that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful. For purposes of this section, 'commerce' includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession." N.C.G.S. § 75-1.1(a)–(b) (2019). Therefore, "[t]o successfully state a claim under [the UDTPA]. . . a plaintiff must allege (1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." *Window World of N. Atlanta, Inc. v. Window World, Inc.*, 2018 NCBC LEXIS 111, at *14–15 (N.C. Super. Ct. Oct. 22, 2018) (cleaned up).

37. In seeking dismissal of Poluka's UDTP claim, Willette and BR Ventures focus solely on the second element, arguing that the Complaint does not state a valid claim for UDTP because Poluka's allegations—even taken as true under the Rule

12(b)(6) standard—fail to describe acts that were "in or affecting commerce" within the meaning of the UDTPA in that they only involve a dispute between members of an LLC. Poluka, conversely, contends that the conduct alleged did, in fact, affect commerce more generally so as to meet the definition of "in or affecting commerce" in the above-quoted statute.

38.     Our Supreme Court has stated that despite the expansive definition of commerce contained in the UDTPA, "the Act is not intended to apply to all wrongs in a business setting." *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 592 (1991). Specifically, "the Act is not focused on the internal conduct of individuals within a single market participant, that is, within a single business." *White v. Thompson*, 364 N.C. 47, 53 (2010). In *White*, the defendant, a former partner in a partnership organized to contract with an outside business, was sued by his former partners and the partnership when he "misinformed plaintiffs about the date of certain projects [the partnership] had been contracted to perform and began working independently while still a[ ] . . . partner." *Id.* at 54. The Court concluded that the defendant's conduct fell outside the scope of the UDTPA, holding that "[b]ecause defendant . . . unfairly and deceptively interacted only with his partners, his conduct occurred completely within the . . . partnership and entirely outside the purview of the Act." *Id.* The Court reached this conclusion despite the fact that the defendant in that case had set up a separate entity to conduct business that had previously been conducted under the partnership, thereby directing opportunities toward his own entity that had formerly belonged to the partnership. *Id.* at 49, 53.

39.     On a number of occasions, this Court has been required to engage in the task of determining whether acts alleged in a business dispute between owners of a single entity were "in or affecting commerce" for purposes of the UDTPA. *See, e.g.*, *Botanisol Holdings II, LLC v. Propheter*, 2021 NCBC LEXIS 94, at \*\*24–28 (N.C. Super. Ct. Oct. 18, 2021); *Potts v. KEL, LLC*, 2018 NCBC LEXIS 24, at \*12–16 (N.C. Super. Ct. Mar. 27, 2018); *JS Real Estate Invs. LLC v. Gee Real Estate, LLC*, 2017 NCBC LEXIS 104, at \*17–22 (N.C. Super. Ct. Nov. 9, 2017).

40.     In *Botanisol*, the "[p]laintiff alleg[ed] that [defendant] created [a new LLC] to divert opportunities away from [plaintiff and defendant's original LLC] and away from [p]laintiff, as the co-member of the [original LLC]." *Botanisol*, 2021 NCBC LEXIS 68, at \*66. This Court ruled that the plaintiff had failed to state a valid UDTP claim at the Rule 12(b)(6) stage because "the focus of the deception was on [the original entity] and its members and was not 'in or affecting commerce.'" *Id*.

41.     *Potts* involved claims by one corporate shareholder against another shareholder who had engaged in self-dealing transactions that funneled money allegedly belonging to the corporation toward entities owned by himself and family members. *Potts*, 2018 NCBC LEXIS 24, at \*2–5. The plaintiff asserted a UDTP claim, arguing that the wrongful conduct by the other shareholder was "in or affecting commerce" within the meaning of the UDTPA because the transactions "were not confined within [the original corporation.]" *Id.* at \*12–14. This Court rejected this argument, concluding that the plaintiff failed to state a claim for UDTP under Rule 12(b)(6). The Court noted that the

[defendant] may have carried out his mismanagement and misappropriation of [the corporation's] assets by channeling money and equipment to [an entity set up to benefit defendant and his family] and diverting a corporate opportunity to [a different family member's business]. But the unfairness of these actions, if any, inheres in the relationship between [plaintiff and defendant] *as co-owners* of [the original corporation].

*Id.* at *15.

42. Finally, in *JS Real Estate*, two former real estate business partners separated, agreeing to share in the proceeds from their prior ventures that continued to generate revenue. *JS Real Estate*, 2017 NCBC LEXIS 104, at *4–8. The former partners had set up "Management Companies" (owned jointly by the two partners) to receive proceeds from those real estate projects, and those proceeds were meant to be shared between the two partners pursuant to their Separation Agreement. *Id.* However, the defendant, one of the former partners, paid money to one of his own personal LLCs using funds generated from the Management Companies "in violation of [the partners'] Separation Agreement." *Id.* at *7.

43. Although the plaintiff (the other partner) attempted to assert a claim for UDTP, this Court determined that defendants' acts did not fall within the ambit of the UDTPA because "[b]y its nature, this dispute [did] not concern the regular interactions of separate market participants. Rather, it [was] a dispute between members of the Management Companies over the companies' internal management and the members' right to receive distributions[.]" *Id.* at *17–20. The Court further rejected the argument that the conduct was "in or affecting commerce" because funds had been channeled from the Management Companies toward an outside LLC held

by the defendant, ruling that the presence of that outside LLC "[did] not change the fundamental character of the dispute." *Id.* at \*21.

44. In the present case, the Court similarly concludes that the wrongful acts alleged by Poluka relate to an internal business dispute between members of an LLC such that he has not alleged conduct "in or affecting commerce" within the meaning of the UDTPA.

45. In essence, Poluka contends that Willette abused his position as a member of Capishe to the detriment of the LLC and for Willette's own personal benefit. The allegations of self-dealing at issue here are similar to those this Court has previously found to be outside the UDTPA's definition of "in or affecting commerce" as demonstrated by the cases discussed above. Moreover, the assertions concerning BR Ventures' involvement do not compel a different result. Although the Complaint suggests that money belonging to Capishe may have been funneled to BR Ventures, any injury resulting from such transactions accrued to Capishe and, by extension, Poluka. The mere presence of BR Ventures as a potential beneficiary of Willette's alleged wrongful conduct does not alter the fundamental character of this internal dispute.

46. Nor do the allegations surrounding the registration of the CAPISHE trademark satisfy the "in or affecting commerce" requirement. Although Poluka alleges that BR Ventures fraudulently asserted ownership of the CAPISHE trademark, those allegations are merely another manifestation of Poluka's contention that Willette, as a member of Capishe, acted to the detriment of Capishe and Poluka

by conferring the benefit of a trademark registration away from Capishe and toward a separate entity in which Willette held an interest.

47. The cases cited by Poluka in opposition to Willette and BR Ventures' motion are materially distinguishable. Poluka points to two cases—*Sara Lee Corp. v. Carter*, 351 N.C. 27 (1999) and *Songwooyarn Trading Co v. Sox Eleven, Inc*, 213 N.C. App. 49 (2011)—that, according to him, require this Court to conclude that the alleged misconduct of Willette was "in or affecting commerce." However, both of those cases are materially distinguishable.

48. In *Sara Lee,* an employee of the plaintiff engaged in self-dealing when he directed his employer to enter into contracts with certain entities in which the employee held an ownership interest for computer parts and services. 351 N.C. at 29. In holding that the plaintiff was entitled to recover damages under the UDTPA, our Supreme Court stated the following:

> [W]e conclude that the transactions at issue were "in or affecting commerce" and thus fall within the scope of the [UDTPA]. There is uncontradicted evidence in this case that defendant sold computer parts and services, through his various enterprises, to plaintiff. Trusting that these were legitimate transactions secured at competitive prices in the marketplace, plaintiff regularly conducted business with the companies in which defendant had an interest. In this case, defendant and plaintiff clearly engaged in buyer-seller relations in a business setting, and thus, we hold that defendant's fraudulent actions fall within the ambit of the statutory prohibition of unfair and deceptive acts or practices as determined by the trial court.

*Id.* at 33.

49. In *Songwooyarn*, a foreign entity's owner created a North Carolina-based company to facilitate business relationships in the United States and hired the

defendant to manage the affairs of the North Carolina company. 213 N.C. App. at 51. The defendant worked for the North Carolina entity and was to be paid by taking a portion of the payments made between the foreign entity and the North Carolina entity. *Id.* at 51–52. However, the defendant also improperly took for his own benefit additional portions of those payments between the two entities that were meant not for him but rather for the North Carolina entity. *Id.* The Court of Appeals concluded that the defendant's acts were "in or affecting commerce" within the meaning of the UDTPA because the defendant's conduct "interrupted the commercial flow" between the foreign entity and the North Carolina entity. *Id.* at 57. The Court of Appeals reasoned that the defendant's conduct was effectively an interruption of regular market transactions between two distinct entities in the marketplace. *Id.*

50. The Court is of the view that the present action is more akin to *White*, *Botanisol*, *Potts*, and *JS Real Estate* than to *Sara Lee* or *Songwooyarn*. At its core, this case is simply another example of an internal dispute between members of a single company.

51. For these reasons, the Court GRANTS Willette and BR Ventures' partial Motion to Dismiss.

## CONCLUSION

**THEREFORE**, it is **ORDERED** that Willette and BR Ventures' Motion to Dismiss is **GRANTED**. Poluka's claim for UDTP is hereby **DISMISSED**.

SO ORDERED, this the 2nd day of December, 2021.

/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge for
Complex Business Cases